No. 93,345

STATE OF KANSAS, *Appellee*, v. JOHN PRINE, *Appellant*.

(200 P.3d 1)

Opinion filed January 16, 2009.

*Kerry E. McQueen*, of Sharp, McQueen, McKinley, McQueen & Dodge, P.A., of Liberal, argued the cause, and *Stephen C. Griffis*, of the same firm, was on the brief for appellant.

*Thomas R. Stanton*, deputy district attorney, argued the cause, and *Keith E. Schroeder*, district attorney, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant John Prine was convicted of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child because of his conduct with a 6-year-old girl. He petitioned for our review of the Court of Appeals decision affirming his convictions in *State v. Prine*, No. 93,345, unpublished opinion filed

December 1, 2006. We address K.S.A. 60-455 and sufficiency issues.

### Factual and Procedural Background

Prine's sufficiency claim requires more elaborate discussion of the troubling case than might ordinarily be necessary.

As E.K. was taking her 6-year-old granddaughter, A.M.C., home from kindergarten on December 11, 2003, A.M.C. told her that "John" had touched her in ways he should not have touched her. E.K. notified A.M.C.'s stepmother, J.C., who came home from work and immediately took A.M.C. to the doctor. An examination revealed no injuries. J.C. had asked Prine to babysit A.M.C. and her baby brother and sister that morning; he had babysat for the family before. Prine was the best friend of A.M.C.'s father.

J.C. filed a police report. That day, Sergeant John Taylor of the Hutchinson Police Department's Juvenile Detective Bureau videotaped an interview of A.M.C. Taylor asked A.M.C. about truth and lies, and A.M.C. indicated she understood the difference. Taylor talked about good touching and bad touching, and A.M.C. said that John always gave her bad touches. A.M.C. was able to identify body parts and understood that some were private. She knew a private part on a girl is the chest. She described her bottom and referred to her vagina as her "front." She referred to a penis on a boy as a "front" too.

A.M.C. told Taylor that Prine had touched her "lots of times" when he was babysitting and her parents were gone. She said this had happened in the living room; in the laundry room by the dryer; in her parents' room; and once in the playroom while her brother and sister were present. A.M.C. said Prine touched her between her legs with his fingers, his tongue, and his tummy.

Taylor asked A.M.C. what Prine would do with his fingers when he would touch her between the legs. A.M.C. took her index and middle finger, put them up to her mouth, acting like she had licked them, and then swiped them down between her legs. She said he licked his fingers and put them between her legs. A.M.C. said, "I know what that is. It's a bad touch." She said the fingers went inside and outside.

A.M.C. also said that Prine sometimes used his fingers to pull her front apart and would lick inside. She said, "I don't know why he did that." She said she had asked him why he would do stuff like that to her, and he would not listen; she said he thought what he was doing was fun and funny.

A.M.C. also said that once she was lying on the floor with her clothes on, but with her pants down past her bottom, and Prine put his tummy between her legs and scooted her. She explained that she was on her back, her legs were almost over her head, apart, and John's exposed tummy was touching her. When asked where Prine's tummy was touching her, A.M.C. stood up and pointed to her vagina. Taylor asked her if this was on the inside or out, and A.M.C. said, "I told you, on the inside and outside."

Steve Edwards, a clinical social worker at Horizon Mental Health Center, who interviewed A.M.C. on December 18, 2003, had been working for many years with S.M., Prine's 9-year-old daughter, through a school program. Police interviewed S.M. in late December 2003, and she stated that her father had often given her bad touches. She said she was little when he had sex with her. When asked what she meant, S.M. said Prine would be naked; that he would yell at her; that he would remove her pants; and that he would set her on top of him as he lay in bed. She said she felt his penis on her vagina, but he never did anything with it, and she never saw it. S.M. thought this had happened two or three times, but she did not remember how old she was; when pressed, she suggested it was when she was 4 or 5.

The State charged Prine in four counts. The first three counts related to incidents involving A.M.C.: rape; aggravated criminal sodomy; and aggravated indecent liberties with a child. A second count of aggravated indecent liberties with a child, Count IV, was based on his alleged sexual abuse against S.M.

At Prine's preliminary hearing, the district judge granted a defense motion to dismiss Count IV, because there was no evidence the prosecution of that count had been commenced within 5 years of the commission of the crime. Prine was bound over for trial on the first three counts.

The State moved to admit evidence of other crimes or wrongs pursuant to K.S.A. 60-455. The defense opposed admission of any evidence relating to sexual abuse allegations made against Prine by S.M. or by J.J.S., Prine's half-sister. The State argued the evidence was relevant to prove the material facts of intent, plan, and absence of mistake or accident. Each involved a girl about 5- or 6-years-old and simulation of a sex act without penetration by the penis; two of the cases involved oral sodomy and digital penetration. The defense responded that if the allegations had any probative value, it was far outweighed by potential prejudice; that the allegations were not similar enough to the charged crimes; that any similarities that did exist were common to many sexual abuse allegations; and that the evidence was too remote in time to be probative. The district judge decided that the evidence would be admissible at trial to prove intent, plan, and absence of mistake or accident.

At trial, A.M.C. testified about the three events she had previously described to Taylor. She said that Prine pushed her pants and underwear down, licked his fingers, and touched her front; he spread her legs, put his tongue on her front, and "was just licking it like some dog"; and, one time when she was on the floor and part of her pants were off, Prine pulled her legs apart in the air, put them over his shoulders, and scooted her with his front touching her front. She said the first event happened in the living room, the play room, in her parents' room, and in the laundry room; the second event happened in the living room; and the third event happened in the living room. The first event happened lots of times, she said, almost every day that her parents were not home. She also testified that no one had told her to say these things; rather, "it really happened." She further testified that when she asked Prine to stop and asked him why he did these things, he said it was funny to him. A.M.C. said she told her grandmother about Prine because she did not want these things to happen anymore.

A.M.C.'s trial testimony deviated from her initial interview with Taylor in one respect. She testified that Prine's fingers touched her only outside, rather than the inside and outside which she had spoken about with Taylor.

Edwards testified concerning his initial interview with A.M.C., in which she related the same incidents involving Prine that she had told police about earlier. She had demonstrated Prine's licking of his fingers in the same manner, and she had used anatomically correct dolls to demonstrate where and how Prine had touched her. Edwards further testified that he had seen A.M.C. more than a dozen times since her initial interview, and she remained extremely consistent in her disclosures. He also testified that, although A.M.C. had not experienced a traumatic event such as a tornado, a fire, or seeing someone die, she exhibited signs of post-traumatic stress disorder, including recurring nightmares, sleep disturbance, and exaggerated fear of Prine.

Over a defense objection, Edwards also testified that, before his initial meeting with A.M.C. in December 2003, he had performed a sexual abuse evaluation on then 8-year-old S.M. S.M. told Edwards that Prine would force her to go into his bedroom, would put honey on his private part, and would force her to "get back on him." She told Edwards defendant would laugh at her when she tried to wash away the honey that had gotten on her private part.

Also over a defense objection, 9-year-old S.M. testified that Prine had touched her in a bad way. She testified specifically that Prine had taken her clothes off and gotten on top of her. She testified that, when she was 3 or 4, he put honey on his private part and got on top of her. He laughed at her when she tried to wash off the honey that had gotten on her. S.M. also said that Prine "smacked" her.

S.M.'s mother testified over objection that, in December 2002, S.M. had told her she had been naked and defendant had laid her on top of him. S.M. had asked her mother if that act was sex.

J.J.S., Prine's 27-year-old half-sister, testified that Prine had sexually abused her when they lived in the same house in the 1980's. Specifically, J.J.S. said that, when she was 4 or 5 years old and Prine was 17, he forced her to perform oral sex on him; he performed oral sex on her; he put his penis between her legs and rubbed it on her vagina; and he put his pointer and middle fingers inside her vagina after wetting them in his mouth. J.J.S. performed the same action that A.M.C. had performed to demonstrate. J.J.S.

also testified that once, two of her other half-brothers had witnessed her performing oral sex on Prine.

M.S., Prine's stepbrother, testified that, when he was about 12 years old, he saw his 5-or 6-year-old half-sister, J.J.S., performing oral sex on Prine.

The district judge also admitted, over objection, a 1993 police report J.J.S. had filed about Prine's sexual abuse.

Nick Prine, the defendant's other brother, was the sole witness presented by the defense. Nick denied ever witnessing any sexual acts between Prine and J.J.S.

Pursuant to an earlier *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), hearing and ruling, the State also introduced evidence from KBI Special Agent Ricky Atteberry, who testified that Prine voluntarily made statements to the police concerning A.M.C.'s allegations in an interview on January 7, 2004. In that interview, Prine denied A.M.C.'s general allegations of sexual abuse, but he suggested that three innocent incidents might explain her stories. He suggested that, on one occasion, he had been roughhousing with A.M.C. and had picked her up with one arm under her crotch. He also said that, during the previous summer, he and A.M.C. were swimming and the bottoms of her swimsuit had moved to one side, exposing her vagina, and that she had slid down his arm, thus rubbing her vagina against his arm. On another occasion, Prine said he was looking at pornography on his computer when A.M.C. came into the room. Because she had peanut butter and jelly on her face, he licked his thumb and wiped the peanut butter and jelly off of her face.

J.C. testified that A.M.C. did not have a swimsuit at the place and during the time frame about which Prine testified.

The State also introduced evidence that Prine had tried to blackmail A.M.C.'s mother into dropping the charges against him by threatening to tell police that her husband, A.M.C.'s father, was stealing from his workplace.

Finally, Taylor testified concerning his involvement in the case and his initial interview with A.M.C. The videotape of the interview was played for the jury, but the video tape was not included in the record on appeal.

The jury was given a limiting instruction on the prior sexual abuse evidence involving S.M. and J.J.S. It read: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's intent, plan, absence of mistake or accident."

During deliberations, the jury asked the district court to "elaborate on what constitutes penetration. If a finger or fingers or tongue touch only the clitoris, does that constitute a penetration of the female anatomy or labia, or vaginal opening, or simply if someone touches the clitoris, would that constitute penetration?" The court responded by directing the jury to reread Instructions No. 3 and No. 7. Instruction No. 3 told the jury to determine the weight and credibility to be given each witness and to use its common sense, knowledge, and experience in evaluating testimony. Instruction No. 7 set out the elements of rape and defined sexual intercourse as "any penetration of the female sex organ by a finger or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse."

Two and ½ hours after initially retiring for deliberations, the jury returned a verdict of guilty on each of the three counts.

At sentencing, the district judge denied Prine's motions for judgment of acquittal, new trial, and downward departure. Prine argued that he had been set up because he had rejected a romantic proposition from A.M.C.'s mother, his best friend's wife. He then accused the district judge of failing to be impartial, of unfairly favoring the prosecution. After the judge advised Prine to "keep the cussing to [him]self," Prine launched into a tirade of abusive language that earned him eight counts of direct criminal contempt. Each count added a consecutive 6 months to his sentence.

Based on a criminal history score of G for a prior felony failure to pay child support conviction, Prine received a 203-month sentence for rape; a 123-month sentence for aggravated criminal sodomy; and a 61-month sentence for aggravated indecent liberties with a child. Each was consecutive to the others, as well as to the multiple contempt sentences.

Prine argued four issues to the Court of Appeals: (1) There was insufficient evidence of penetration to support his conviction of rape; (2) the district judge erred in admitting evidence of his prior activities with S.M. and J.J.S.; (3) the district judge erred in admitting a photograph of him with a mustache, which matched A.M.C.'s description of him; and (4) the district judge erroneously denied his request for a downward departure sentence.

A majority of the Court of Appeals' panel affirmed in part and dismissed in part. *Prine*, slip op. at 13. On the sufficiency claim, one of the two issues before this court, the majority noted that, contrary to Prine's assertion, actual penetration of the vagina is not required to establish sexual intercourse, and "any penetration, however slight, is sufficient." Slip op. at 6-7. The majority wrote: "[P]enetration of the vagina or rupturing of the hymen is not necessary; penetration of the vulva or labia is sufficient" to establish sexual intercourse. Slip op. at 6-7 (citing K.S.A. 21-3501(1) and, *inter alia, In re B.M.B.*, 264 Kan. 417, 434, 955 P.2d 1302 [1998]). The majority concluded that the record contained sufficient evidence that "the defendant penetrated at least the victim's vulva or labia with his lubricated fingers" and that, based on this evidence, "a rational factfinder could have found the defendant guilty of rape beyond a reasonable doubt." *Prine*, slip op. at 7.

On the K.S.A. 60-455 issue, the majority set out its standard of review as abuse of discretion. It noted that two of the three material factors the prior sexual abuse evidence was admitted to prove— absence of mistake and the presence of intent—were related concepts. Slip op. at 9 (citing *State v. Davidson*, 31 Kan. App. 2d 372, Syl. ¶ 2, 65 P.3d 1078, *rev. denied* 276 Kan. 971 [2003]). Although Prine categorically denied A.M.C.'s allegations against him, he had offered possible innocent explanations for them. The majority held that when a defendant creates "an inference of innocent motive," evidence of a prior bad act sufficiently similar to the alleged crime becomes relevant and material to the jury's determination of guilt. Slip op. at 9-10 (citing *State v. Dotson*, 256 Kan. 406, 413, 886 P.2d 356 [1994]; *State v. Nunn*, 244 Kan. 207, 212, 768 P.2d 268 [1989]; *State v. Kackley*, 32 Kan. App. 2d 927, 930, 92 P.3d 1128 [2004]). This was true, despite the general rule that evidence of prior crimes

is inadmissible to show intent when intent is obviously proved by the mere doing of the charged act. See *Nunn*, 244 Kan. at 212.

Moreover, the majority observed, when the facts of a prior act and an alleged crime are "strikingly similar," the prior act is admissible to demonstrate that defendant had a plan or employed a distinct method of operation. *Prine*, slip op. at 10-11 (citing *State v. Jones*, 277 Kan. 413, 421, 85 P.3d 1226 [2004]). The majority said there were "a number of specific similarities" between the crime charged and the evidence of Prine's behavior with S.M. and J.J.S.: "All victims were extremely young, 4-6 years of age, when the abuse occurred." *Prine*, slip op. at 11. In both S.M.'s and A.M.C.'s cases, the defendant laughed at the victims; in A.M.C.'s and J.J.S.'s cases, defendant had licked his fingers and rubbed them on the victims' genital areas. "Despite some difference . . . the defendant's conduct was sufficiently similar to demonstrate a plan or common approach. Therefore, the prior bad acts were relevant and material to demonstrate a plan or a common course of conduct by the defendant." Slip op. at 11 (citing *Kackley*, 32 Kan. App. 2d at 932).

The majority acknowledged that a determination of relevance, *i.e.*, the existence of probative value, and the existence of materiality to an actual issue, formed only part of the K.S.A. 60-455 analysis; a district judge also must weigh any probative value against potential prejudice to the defendant. In this case, the majority held that the probative value of evidence of Prine's intent was slight because of his general denial, but "the combined value of the prior bad acts evidence to prove intent, an absence of mistake or accident, and plan outweighed the potential prejudice to the defendant." Slip op. at 11-12. The majority was "firmly convinced" that the district court did not abuse its discretion in admitting the prior sexual abuse evidence under K.S.A. 60-455. Slip op. at 12.

Court of Appeals Judge Richard Greene dissented, suggesting that an abuse of discretion standard does not come into play on a K.S.A. 60-455 issue unless and until a reviewing court determines that "(1) the evidence was relevant to prove one of the facts specified in K.S.A. 60-455; (2) the fact being proven is a disputed, material fact; and (3) the probative value of the evidence sought

to be admitted outweighs its potential prejudice." Slip op. at 14 (Greene, J., dissenting). According to the dissent, application of the precedent cited by the majority required the opposite conclusion: The prior sexual abuse evidence was not admissible to prove intent, plan, or absence of mistake or accident. Slip op. at 14-15.

Judge Greene relied on the general rule that prior sexual conduct is inadmissible to show intent when criminal intent is obviously proved by the mere doing of the charged act. Slip op. at 14 (citing *Dotson*, 256 Kan. at 413; *Nunn*, 244 Kan. at 212; *Kackley*, 32 Kan. App. 2d at 930.) He concluded: "[T]he allegations of defendant's conduct toward A.M.C. were so egregious that there was no room for any inference of innocent conduct, thus eliminating any need for evidence of intent." *Prine*, slip op. at 15 (Greene, J., dissenting).

Judge Greene also suggested that absence of mistake or accident was not a basis for admissibility unless a defendant had offered an explanation of mistake or accident *for the criminal acts alleged in the case*. Slip op. at 15. Here, he argued, the defendant did not claim that he accidentally touched A.M.C. "at the times and places charged, but offered an explanation that he may have accidentally touched her at other times and places. This does [not] place in dispute . . . mistake or accident. . . ." Slip op. at 15 (citing *Davidson*, 31 Kan. App. 2d at 379-83).

Judge Greene also took issue with the degree of similarity between the allegations made by A.M.C. and those made by S.M. and J.J.S. In his view, the differences were marked. The only similarities—the relative age of the victims and Prine's amusement at their degradation—were not enough to demonstrate modus operandi or plan. Slip op. at 15-17. As in *Jones*, 277 Kan. at 423, Judge Greene wrote: " '[T]here simply was insufficient evidence presented to show a distinct method of operation that could be considered "signature" or "strikingly similar" or even "similar enough" for K.S.A. 60-455 purposes.' " *Prine*, slip op. at 17.

Judge Greene ultimately would have held that reversal was necessary on the K.S.A. 60-455 issue, because the State's case rested entirely on the victim's testimony, what she had told others, and

the evidence of prior sexual abuse. Slip op. at 17-19 (Greene, J., dissenting).

### K.S.A. 60-455 Evidence of Prior Sexual Abuse

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

In *State v. Vasquez*, 287 Kan. 40, 194 P.3d 563 (2008), we review the current requirements for admission of evidence of prior crimes or civil wrongs under K.S.A. 60-455 and the standards of appellate review applicable to each facet of the analysis. *Vasquez* relies on our recent decision in *State v. Reid*, 286 Kan. 494, 503, 186 P.3d 713 (2008), stating:

" '[T]he K.S.A. 60-455 analysis requires several steps. . . . [T]he court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in.' [Citations omitted.]" *Vasquez*, 287 Kan. at 49.

We observe in *Vasquez* that *Reid* refined and extended our earlier ruling in *State v. Gunby*, 282 Kan. 39, 47-48, 56-57, 144 P.3d 647 (2006):

" 'While *Gunby* established that evidentiary rules may be applied either as a matter of law or in the exercise of the trial court's discretion, depending on the contours of the rule in question, this particular determination only occurs "[o]nce relevance is established." 282 Kan. at 47. *Gunby* did not establish our standard of review for analyzing relevance of certain K.S.A. 60-455 evidence.

" '[T]he legislature has defined "relevant evidence" as "evidence having any tendency in reason to prove any material fact." This statutory definition bears some resemblance to one found in Federal Rule of Evidence 401: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

" 'Several treatises have recognized that the federal rule contains both a probative, *i.e.*, relevancy, element and a materiality element.' *Reid*, 286 Kan. at 504." *Vasquez*, 287 Kan. at 49.

*Vasquez* then continues:

"Our *Reid* decision then observed that materiality merged into the federal rule on relevancy through inclusion of the ' "requirement that the fact proved must be 'of consequence to the determination of the action.' . . . Determining whether evidence is 'consequential' depends on the applicable substantive law." ' " 286 Kan. at 504-05 (quoting Mueller & Kirkpatrick, Evidence Practice Under the Rules § 4.2, pp. 228-29 [2d ed. 1999]; citing 1 Federal Rules of Evidence Manual, § 401.02[2] [9th ed. 2006] ['Both traditional requirements of relevance analysis—that evidence must relate to issues that are properly in dispute and that it must shed some light on those issues—are combined into one rule. Whether an issue is properly in dispute is, of course, determined by the applicable substantive law.'])." *Vasquez*, 287 Kan. at 50.

*Vasquez* explicitly recognizes that Kansas law, K.S.A. 60-401(b), mirrors federal law on the two components of the relevance concept. See *Vasquez*, 287 Kan. at 50 ("As *Reid* stated: ' "Evidence having any tendency in reason to prove" suggests the probative element, while "any material fact" suggests the materiality element.'); 286 Kan. at 505." Moreover, we say in *Vasquez* that "both elements have a place under K.S.A. 60-455 because of the statute's references to both relevance— *i.e.*, probativeness—and materiality. *Reid*, 286 Kan. at 505. In other words, the concept of relevance under Kansas law includes both whether evidence is probative and whether it is material." *Vasquez*, 287 Kan. at 50.

*Vasquez* also addresses the applicable standards of review on appeal:

"On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. *Reid*, 286 Kan. at 507-09. With respect to relevance overall, *Reid* concluded: 'Obviously, if either the probative or materiality element's standard is not met, then the evidence is inadmissible. If both standards are met, then the appellate court proceeds to the next step(s) in the [K.S.A.] 60-455 analysis established in *Gunby*.' *Reid*, 286 Kan. at 509.

"The second step under K.S.A. 60-455, *i.e.*, whether the fact was in issue at trial, is judged on appeal under a de novo standard. An appellate court is as capable

of discerning whether a particular fact was in issue from a cold record. The third step, the district judge's weighing of probative value and prejudicial effect, is reviewed on appeal for abuse of discretion, a more deferential standard. See *Reid*, 286 Kan. at 512.

"If evidence qualifies for admission under K.S.A. 60-455 but no limiting instruction was given, the standard of review should match that applied to other jury instruction issues. If the defense requested a limiting instruction and was refused or it otherwise objected to its omission by the district judge, the standard on appeal is that set out in K.S.A. 60-261; to be reversible, the error must be inconsistent with substantial justice. See *Gunby*, 282 Kan. at 48, 57-59. If the defense did not request a limiting instruction and it failed to object to its omission, the absence of a limiting instruction is reviewed on appeal under the clearly erroneous standard of K.S.A. 22-3414(3). *Reid*, 286 Kan. at 513. ' "Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred." [Citation omitted.]' *State v. Shirley*, 277 Kan. 659, 666, 89 P.3d 649 (2004)." *Vasquez*, 287 Kan. at 50-51.

Finally, *Vasquez* also notes our *Gunby* clarification of the role of harmless error analysis under K.S.A. 60-455: " '[T]he admission of K.S.A. 60-455 evidence without the explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, or prophylactic limiting instruction is not inevitably so prejudicial as to require automatic reversal. On the contrary it may be harmless.' " *Vasquez*, 287 Kan. at 51 (quoting *Gunby*, 282 Kan. at 57); see K.S.A. 60-261.

Intent

The State's first basis for admission of evidence about Prine's prior sexual abuse of S.M. and J.J.S. was intent. We hold that it would not have been an abuse of discretion for the district judge to decide that the first component of relevance, the existence of probative value, was satisfied on intent. The fact that Prine molested other young girls in the past, given today's jurors' common understanding of the psychology of those who commit such crimes, actually "shed[s] some light" on the existence of intent in this case. In this context, we use the word "intent" in the broader sense of the overall guilty mind or *mens rea* required for proof of criminal behavior, rather than in the particular sense of the "general intent" or "specific intent" required for proof of certain crimes. In this

case, Prine was charged with two general intent crimes—rape under K.S.A. 21-3502 and aggravated criminal sodomy under K.S.A. 21-3506—and a specific intent crime—aggravated indecent liberties with a child under K.S.A. 21-3504. The elements of aggravated indecent liberties with a child include an "intent to arouse or satisfy the sexual desires of either the child or the offender, or both." K.S.A. 21-3504.

At least in the abstract, prior sexual abuse of others by Prine also could, as a matter of law, satisfy the second component of relevance, materiality. Criminal intent generally is "properly in dispute" in rape, aggravated criminal sodomy, and aggravated indecent liberties with a child cases.

The going gets tougher for the State on the second part of the K.S.A. 60-455 test, *i.e.*, whether intent actually was in issue at Prine's trial, also judged on appeal under a de novo standard. We agree with Judge Greene that, given the record before us and the egregious nature of the behavior alleged here, intent was not actually in issue. It was simply a given that, if the sexual abuse of A.M.C. occurred as described by her, it was motivated by criminal intent. See *State v. Rucker*, 267 Kan. 816, 825-26, 987 P.2d 1080 (1999); *Nunn*, 244 Kan. at 212-13 (evidence of prior sexual misconduct against children not admissible to prove intent because intent not in issue; defendant denied any involvement); see also *State v. Synoracki*, 253 Kan. 59, 71-74, 853 P.2d 24 (1993) (prior crime admissible to prove intent in murder trial; defendant argued self-defense); *State v. Graham*, 244 Kan. 194, 198, 768 P.2d 259 (1989) (prior crimes evidence admissible to prove intent; drug possession case); *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974) (when armed robber extracts money at gunpoint, felonious intent not in issue); *Kackley*, 32 Kan. App. 2d at 930 (prior bad acts inadmissible when defendant's act of placing victim's hand on his penis leaves no room for an inference of innocence). The acts alleged in this case were criminal in and of themselves. No adult would engage in the activities supporting the charges against Prine without the *mens rea* required by the statutes defining the three crimes.

We need go no further in our analysis of whether there was error in admitting the evidence of Prine's prior sexual abuse of S.M. and J.J.S. to prove intent. There was.

## Absence of Mistake or Accident

The State's admission of the prior sexual abuse evidence to prove absence of mistake or accident breaks down in the same manner as its admission of the evidence to prove intent. Indeed, the two bases for admission of K.S.A. 60-455 evidence are largely intertwined. *State v. Plaskett*, 271 Kan. 995, 1020, 27 P.3d 890 (2001) ("Intent and related facts are not at issue in that defendant denied all allegations."); *State v. Spurlock*, 30 Kan. App. 2d 921, 927, 52 P.3d 371, *rev. denied* 274 Kan. 1118 (2002) (prior crimes evidence inadmissible to prove intent; defendant did not offer innocent explanation); *State v. Gibson*, 30 Kan. App. 2d 937, Syl. ¶ 4, 52 P.3d 339, *rev. denied* 274 Kan. 1115 (2002) ("The crucial distinction in admitting evidence of other crimes under K.S.A. 60-455 on the issue of intent is not whether the crime is a specific or general intent crime, but whether the defendant has claimed that his or her acts were innocent."); see *State v. Chubb*, No. 91,708, unpublished Court of Appeals opinion filed December 2, 2005, *rev. denied* 281 Kan. 1379 (2006); *cf. State v. Clements*, 252 Kan. 86, 89-90, 843 P.2d 679 (1992) (intent in issue when defendant admitted act; question for trial whether defendant's physical contact with complaining witness therapeutic massage of sore back or sexual battery).

Here, absence of mistake or accident was not actually in issue in Prine's trial. The State's introduction of evidence about Prine's hypothesis during his law enforcement interview that A.M.C. could have become confused by certain other incidents of nonsexual touching was insufficient to support admission of contrary evidence by the State. The hypothesis did not inform Prine's position at trial; his defense was a categorical denial that any of the alleged events took place. Under these circumstances, the State could not open the door for itself to put S.M. and J.J.S. on the stand to rebut an innocent explanation advanced by Prine. The evidence it introduced from his interview bore no relationship to the defense theory

of the case at trial. Admission of the prior sexual abuse evidence to prove absence of mistake or accident was error.

Plan

One of the avenues through which evidence of prior crimes or civil wrongs can be probative of plan or modus operandi—satisfying the first component of relevance, an ability to shed some light on a contested fact—is similarity. See *State v. Damewood*, 245 Kan. 676, 681-82, 783 P.2d 1249 (1989) (citing *State v. Morgan*, 207 Kan. 581, 582, 485 P.2d 1371 [1971] [testimony from two women that defendant raped them " 'under somewhat similar circumstances' " to that of victim admissible to show plan]; *State v. Hampton*, 215 Kan. 907, 909-10, 529 P.2d 127 [1974] [prior crimes evidence bearing "marked similarity" admissible]). If a defendant's past bad acts are sufficiently similar to the acts alleged to support the charges on trial, the existence of probative value is established.

In *Damewood*, Darwin Gene Damewood befriended 14-year-old J.A. by interesting J.A. in Damewood's beekeeping operation. Using beekeeping to isolate J.A. from others, Damewood proceeded to sexually molest him and threatened to punish J.A. if he told anyone. A second incident occurred, after which J.A. told his parents. At Damewood's trial, the State presented the testimony of M.S.R., who, at 13 years old, had been drawn into beekeeping by Damewood and then sexually abused for several years. On appeal, this court found no error in admitting evidence of the prior crime because it was so "strikingly similar"; thus, it was admissible to describe "the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes." 245 Kan. at 681-82.

This court stated that

"[t]he rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. [Citations omitted.]" *Damewood*, 245 Kan. at 682.

Another line of cases has held evidence of prior crimes or acts is admissible to show plan when there is some direct or causal connection between the earlier conduct and the crimes charged. 245 Kan. at 682-83 (citing *State v. Gourley*, 224 Kan. 167, 170, 578 P.2d 713 [1978]; *State v. Marquez*, 222 Kan. 441, Syl. ¶ 4, 565 P.2d 245 [1977]).

This court has consistently recited these two theories for admission of K.S.A. 60-455 evidence to prove plan, but our formulation of the standard of similarity employed under the first theory has varied somewhat from case to case.

*State v. Jones*, 277 Kan. 413, 85 P.3d 1226 (2004), upon which both the Court of Appeals majority and dissent relied in this case, demonstrates the difficulty we have encountered in describing the necessary similarity in a child sexual abuse case. In that case, defendant Charlie Jones, Jr., had been paroled from prison after a conviction of indecent liberties with a child. He met and moved in with L.W. and her daughter, M.W., who was then 9 years old. When M.W. turned 12 in 1996, defendant began having sex with her. This activity did not cease after M.W. told L.W. about it in 1998, and it continued at least weekly until 2001. According to M.W., Jones told her he loved and cared for her very much. She testified she still loved him very much. In 1999, Jones' natural daughter from a previous marriage, S.J., who was just 15 months older than M.W., moved in. Shortly after S.J. moved in, Jones allegedly orchestrated a group sexual "ritual" or "initiation" with L.W., S.J., and M.W., during which the women wore "colors." Jones had sex with each woman, while digitally penetrating the others, and told them all that he loved them. Thereafter, Jones also began having sex with S.J. once or twice a week until she moved out in July 2001 after turning 18. In November 2001, Jones was charged in eight counts for his sexual abuse of S.J. and M.W. after the sordid details of the girls' life began to unfold. Jones denied the abuse and offered evidence of a back injury that would have prevented the alleged group sex incident.

At trial, the district court permitted the State to introduce evidence of Jones' prior conviction of indecent liberties with a child to prove plan. L.D., the victim in the earlier case, testified that her

mother had been married to Jones. When L.D. was 8 or 9 years old, Jones began molesting her by taking off her clothes, touching her with his hands and penis, and rubbing himself on her. Jones attempted but never achieved sexual intercourse with L.D. L.D. testified Jones would masturbate, fondle her vagina and breast areas, and tell her that he loved her. He also wanted her to say she loved him. These incidents always happened when they were alone; Jones had told her to keep the activity a secret; and he pleaded guilty when she eventually reported the sexual abuse. L.D.'s mother never participated in the activities; and there was no talk of "colors, rituals, or 'family values.' " *Jones*, 277 Kan. at 418.

The *Jones* majority, citing *State v. Tolson*, 274 Kan. 558, 564, 56 P.3d 279 (2002), acknowledged that the *Damewood* case contained "so distinct a method of operation as to be a 'signature,' " while other cases, such as *Clements* 252 Kan. at 90, "have upheld the admission of such evidence with no requirement of 'striking' similarities but because the evidence showed that the general method used is 'similar enough to show a common approach that is tantamount to a plan.' " *Jones*, 277 Kan. at 421.

The majority held that the facts of *Jones* failed to meet either standard of similarity. 277 Kan. at 421. It reached this conclusion after reviewing cases such as *Davidson*, 31 Kan. App. 2d at 384, in which the Court of Appeals had rejected admission of prior bad acts evidence to show plan. *Jones*, 277 Kan. at 421-22. In *Davidson*, the panel had reasoned that the differences between the prior acts and the current allegations were substantial, and the similarities either common to nearly all sexual abuse cases or lacking in any "striking" similarities. See *Jones*, 277 Kan. at 422-23.

Justice Davis, joined by Chief Justice McFarland, dissented in *Jones*. Under the same precedent cited by the majority, the dissent would have held that "[Jones'] conduct in the prior conviction was similar enough to his conduct in some of the instant charges . . . to warrant admission of the defendant's prior conviction for indecent liberties with a child" and that the similarities between the prior acts and the current allegations would make it "difficult to conclude that the trial court abused its discretion in admitting the

prior conviction evidence." 277 Kan. at 430-431 (Davis, J., dissenting).

In *State v. Kackley*, 32 Kan. App. 2d 927, 92 P.3d 1128 (2004), also relied on by both the Court of Appeals majority and dissent in this case, the Court of Appeals grappled with the same problem. Defendant Leslie Kackley was charged with two counts of aggravated indecent liberties with a child for his conduct with A.G.; at trial, the district court admitted evidence of defendant's prior no-contest pleas for conduct involving C.D. As set out by the panel, the similarities were: (i) A.G. and C.D. were 10-year-old girls; (ii) both victims were known to Kackley; (iii) access to the children was gained through friendship with the children's parents; (iv) Kackley had the children touch him rather than the reverse; (v) one or more siblings were present in the home at the time of incidents; and (vi) Kackley began each sexual contact by placing the child's hand on his penis. The dissimilarities were: (i) Although Kackley had no family connection with A.G., he lived with C.D.'s family and filled a quasi-parental role; (ii) adults were present in the house at the time of the incident with A.G., whereas no adults were present for the incidents involving C.D.; and (iii) following Kackley's placing of A.G.'s hand on his penis, he told her to keep her hand there but she withdrew it, whereas, after Kackley placed C.D.'s hand on his penis, he forced her to give what she described as "hand jobs." 32 Kan. App. 2d at 931-32.

The panel concluded that the feature distinguishing this case from *Jones* was that Kackley had a "signature" act of first placing the underage girls' hands on his exposed penis; "it is a signature act because it is so strikingly similar in pattern or modus operandi as to authenticate the conduct as the defendant's when it is allegedly replicated in a later case." 32 Kan. App. 2d at 932.

Others among our cases have upheld convictions by concluding that similarities were sufficient to admit prior bad acts to prove plan or modus operandi. In *State v. Overton*, 279 Kan. 547, 112 P.3d 244 (2005), defendant Earnest Overton was an eighth-grade science teacher who separately befriended his three 14-year-old female victims, G.B., T.R., and A.D. Several years after the girls had graduated from middle school, Overton was charged with rape

and aggravated indecent liberties with a child as to each; he responded to the charges with a general denial. The charges pertaining to A.D. were dismissed at Overton's preliminary hearing because the 5-year statute of limitations had run. After a trial including A.D.'s testimony to prove plan, a jury convicted Overton of rape and aggravated indecent liberties with a child as to G.B. and acquitted him of the charges as to T.R.

On appeal, this court upheld the admission of A.D.'s testimony because we regarded the prior bad acts it described as strikingly similar to the current allegations as to G.B. Both girls were minor students at the school where defendant taught; both were 14 years old when defendant began talking to them; both students confided in defendant about their family problems; defendant complimented both students and arranged to be alone with them at school, where he kissed and fondled each of them; defendant hired both students as babysitters; and defendant raped each of them on a particular bed in his home.

In *Overton*, our opinion did not focus on dissimilarities between the girls' stories of sexual abuse. This could be due in part to an easing of our analytical burden by the limited defense argument on appeal. Overton argued that prior bad act evidence to support plan was admissible only when it bore a direct and causal relationship to the charged crimes, *i.e.*, the second theory noted above. This theory was clearly inapplicable.

In *Rucker*, 267 Kan. 816, defendant Frank Rucker was charged with crimes relating to the abuse of his daughter. He denied that the illegal acts occurred. The State sought to introduce testimony about prior sexual abuse of Rucker's other daughter. Both victims were abused from age 5 to puberty; both were legal children of Rucker; both testified that he applied a lotion or oil to their vaginal area and that he rubbed his penis there until he ejaculated; penetration was not in evidence in either situation; each girl said that Rucker slapped her if she protested; and each said he threatened to kill their pets if they reported the abuse. Finding the evidence of prior sexual abuse "substantially similar," this court held that it was properly admitted under K.S.A. 60-455 to prove plan or method of operation. 267 Kan. at 827-29.

The results in *Damewood, Kackley, Overton,* and *Rucker* are consistent with those in other cases in which we concluded that a sufficient degree of similarity existed between prior bad acts and the current allegations to permit evidence of the prior bad acts to come in under K.S.A. 60-455 to prove plan. See *State v. Moore,* 274 Kan. 639, 647-48, 55 P.3d 903 (2002) (similar pattern of conduct between prior conviction and charged crime; both involved young girls of comparable age; defendant surreptitiously videotaped the girls at play as preface to criminal conduct, which involved fondling the victims' genitals or exposing himself; both crimes occurred in private, where defendant had control of environment, his home or his store); *State v. Tiffany,* 267 Kan. 495, 498-502, 986 P.2d 1064 (1999) (similar words used to entice victims into performing requested acts; victims approximately same age; criminal conduct performed in same manner); compare *Clements,* 252 Kan. at 87-90 (defendant's treatment of boys "similar enough to show a common approach that is tantamount to a plan"; evidence that defendant had performed oral sex on 11 year old admitted in trial involving two incidents in which he gave backrubs to two boys on separate occasions, put his hand down one boy's pants, performed oral sex on other boy); *State v. Aldaba,* 29 Kan. App. 2d 184, 189-92, 25 P.3d 149 (2001) (both victims young boys; perpetrator forced his penis into child's mouth in each incident; incidents occurred when defendant staying overnight in same residence with victim; each victim threatened with bodily harm if sexual abuse revealed).

The problem is that it is difficult to distinguish the factual comparisons made in these cases to those made in cases in which the opposite conclusion was reached, *i.e.,* that the prior bad acts and current allegations were too dissimilar to permit K.S.A. 60-455 evidence to prove plan or modus operandi. See, *e.g., Jones,* 277 Kan. at 421-23; *State v. Dayhuff,* 37 Kan. App. 2d 779, 790-94, 158 P.3d 330 (2007) (evidence of defendant's prior sexual abuse of former girlfriend's daughter not strikingly similar to conduct underlying charge of aggravated indecent liberties with former wife's daughter; all incidents involved defendant reaching under girl's clothing and touching outside of vagina; dissimilarities included presence

of another adult in room during one incident, secrecy demand to one girl); *State v. Davidson*, 31 Kan. App. 2d 372, 383-84, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003).

We hope and expect that future analytical consistency in these especially wrenching cases, see *Kackley*, 32 Kan. App. 2d at 930 (difficulty in application of law most acute in sex crime prosecutions), can be improved and maximized if we settle on uniform language to describe the degree of similarity that must exist before a district judge admits evidence of prior bad acts to prove plan or modus operandi under K.S.A. 60-455. We regard the standard of "so 'strikingly similar' in pattern or so distinct in method of operation as to be a 'signature,' " see *Jones*, 277 Kan. at 423, to be the most sound and will apply it exclusively when the State's admission of K.S.A. 60-455 evidence to prove plan is challenged on appeal. We believe this standard gives appropriate deference to the current legislative choice of language in the statute, language plainly selected to disallow evidence of prior bad acts admitted only to show propensity to commit a charged crime or crimes. Without such a standard, one with identifiable meat on its bones, the line between mere propensity evidence and plan evidence is simply too thin for this court—or any court—to traverse predictably or reliably.

As mentioned above, this standard governs examination of whether particular evidence has probative value, one of the two components of relevance, as outlined in *Vasquez*, 287 Kan. at 49-50, and *Reid*, 286 Kan. at 504. If a defendant's prior bad act is so strikingly similar in pattern or so distinct in method of operation as to be a signature, then it is probative of defendant's plan in the case at bar. If it is not, then the evidence has no probative value on plan and the evidence is irrelevant if offered for that purpose. On appeal, we will review a district judge's decision under the "signature" standard for an abuse of discretion. See *Vasquez*, 287 Kan. at 50.

Turning to a comparison of the evidence of prior bad acts admitted to prove Prine's plan here, we note that all three crimes are similar in the approximate ages and the gender of the victims. However, the specific sex acts among the victims differed. A.M.C. described discrete events of three types. S.M. described two other

types of activities. The account of J.J.S. bore some similarity to one of the activities in which defendant engaged with S.M. and some similarity to a different behavior described by A.M.C. Under the signature standard we have set forth, even in light of the deferential abuse of discretion standard of appellate review, it was error to admit the evidence of Prine's prior bad acts with S.M. and J.J.S. to prove plan in the trial of A.M.C.'s allegations.

Harmless Error

Having concluded there were errors in admitting evidence of prior sexual abuse of S.M. and J.J.S. to support intent, absence of mistake or accident, and plan, we next move to the question of whether these errors were harmless. The standard for harmlessness is set forth in K.S.A. 60-261:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

See *State v. Woolverton*, 284 Kan. 59, 65, 159 P.3d 985 (2007).

The evidence from S.M. and J.J.S. was undoubtedly prejudicial, but we are not concerned with the garden-variety prejudice necessary for any successful prosecution. We are concerned only with undue or unfair prejudice. See *Vasquez*, 287 Kan. at 53. Because there was no physical evidence corroborating A.M.C.'s account, the State's entire case hinged entirely on A.M.C.'s credibility. A.M.C.'s overall consistency in her account over time and several retellings to a variety of adults was remarkable, especially for a child; but we cannot ignore what had to be very significant support for her credibility from the inadmissible testimony of S.M. and J.J.S. Their descriptions of what must have been bewildering sexual abuse by Prine were prejudicial in the extreme; as a result, we hold that Prine is entitled to reversal of his convictions and retrial without the K.S.A. 60-455 errors we have identified.

We are compelled to make one final set of brief comments on the K.S.A. 60-455 issues raised by this case.

Extrapolating from the ever-expanding universe of cases that have come before us and our Court of Appeals, it appears that evidence of prior sexual abuse of children is peculiarly susceptible to characterization as propensity evidence forbidden under K.S.A. 60-455 and, thus, that convictions of such crimes are especially vulnerable to successful attack on appeal. This is disturbing because the modern psychology of pedophilia tells us that propensity evidence may actually possess probative value for juries faced with deciding the guilt or innocence of a person accused of sexually abusing a child. In short, sexual attraction to children and a propensity to act upon it are defining symptoms of this recognized mental illness. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, pp. 527-28 (4th ed. 1994) (302.2-Pedophilia). And our legislature and our United States Supreme Court have decided that a diagnosis of pedophilia can be among the justifications for indefinite restriction of an offender's liberty to ensure the provision of treatment to him or her and the protection of others who could become victims. See K.S.A. 59-29a01 et seq.; Kansas v. Crane, 534 U.S. 407, 409-10, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002); Kansas v. Hendricks, 521 U.S. 346, 356-60, 371, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997) (Kansas' Sexually Violent Predator Act narrows the class of persons eligible for confinement to those who find it difficult, if not impossible, to control their dangerousness.). It is at least ironic that propensity evidence can be part of the support for an indefinite civil commitment, but cannot be part of the support for an initial criminal conviction in a child sex crime prosecution.

Of course, the legislature, rather than this court, is the body charged with study, consideration, and adoption of any statutory change that might make K.S.A. 60-455 more workable in such cases, without doing unconstitutional violence to the rights of criminal defendants. It may be time for the legislature to examine the advisability of amendment to K.S.A. 60-455 or some other appropriate adjustment to the statutory scheme.

### *Sufficiency of Evidence of Rape*

We briefly address Prine's second issue on petition for review because, if he were to be successful on it, he could not be retried on the rape count. See *State v. Scott*, 285 Kan. 366, Syl. ¶ 2, 171 P.3d 639 (2007).

When sufficiency of evidence is challenged in a criminal case, our standard of review is whether, after review of all the evidence, examined in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *Vasquez*, 287 Kan. at 59; *State v. Morton*, 283 Kan. 464, 474, 153 P.3d 532 (2007).

K.S.A. 21-3502(a)(2) defines rape as "sexual intercourse with a child who is under 14 years of age." K.S.A. 21-3501(1) defines "sexual intercourse" for purposes of rape to include: "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse."

Prine focuses on the distinction between A.M.C.'s trial testimony and her initial statement to Taylor. Because she testified at trial that Prine's fingers touched her only on the outside, he argues, no rational factfinder could have found that there was even slight penetration.

It is true that A.M.C.'s story was not completely uniform on this particular point. She explicitly said in her interview with Taylor that Prine touched her with his fingers on her front, between her legs, "inside and outside." Taylor testified at the preliminary hearing: "I asked her if the fingers went inside. She said they went inside and outside . . . ."

However, at trial, the prosecutor did not elicit exactly the same description of Prine's conduct from A.M.C.:

"Q. Where did you get touched?
"A. My front.
"Q. Where at in your front? Where?
"A. My front on the outside.

   . . . .
"Q. How did he touch you there?
"A. With, with his fingers.

"Q. And what did he do with his fingers?
"A. Licked them and put them on my front.
"Q. I'm sorry, he did what?
"A. He licked them and put it on my front.
"Q. And you said he licked it?
"A. Yes. . . . (indicating).

    . . . .
"Q. Okay. Do you know whether his fingers went inside you or outside, or?
"A. Outside, outside.
"Q. Okay. Do you remember previously talking to the police about this?
"A. Yes.
"Q. Did you say his fingers went in and out?
"A. Out."

Defense counsel followed up on cross-examination:

"Q. Let me ask you this, [A.M.C.]. Let me go ahead and ask you this, Now . . . what you're saying is that it was, that as far as [Prine] and his fingers, it was, it was always on the outside, right?
"A. Yes, only on the outside.

    . . . .
"Q. Okay, and the tongue was on the outside, too?
"A. Yes.
"Q. Okay, and when you're talking about inside and outside you're talking about the play room and the different rooms, right?
"A. Huh?
"Q. You're talking about it was inside the house, right?
"A. Yes, we were always inside the house when he did that."

It is important to note that the jury also watched the videotape of A.M.C.'s interview, produced on the day the sexual abuse was reported.

This court has often stated that the testimony of the victim alone can be sufficient to sustain a rape conviction without further corroboration as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief. *State v. Borthwick*, 255 Kan. 899, 904, 880 P.2d 1261 (1994); *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 (1993).

We regard the evidence as sufficient to support a rape conviction. Prine's argument ignores A.M.C.'s videotaped statement and her many consistent repetitions of the essentials of her account. It also ignores the common-sense inference of penetration that might

be drawn from other evidence, such as A.M.C.'s repeated descriptions of him licking his fingers. Prine may be retried on the rape count.

Reversed and remanded for new trial.

DAVIS and JOHNSON, JJ., not participating.

McANANY, J., and LARSON, S.J., assigned.

McFARLAND, C.J., dissenting: I respectfully dissent from the majority's decision that in order for evidence of prior bad acts to be considered relevant to prove plan under K.S.A. 60-455, "the evidence must be so strikingly similar in pattern or so distinct in method of operation to the current allegations as to be a signature." I further dissent from the decision reversing the defendant's convictions.

The majority's decision rests only on the conclusion that the "sufficiently similar" standard for admissibility of prior crimes evidence to prove plan in child sex abuse cases has been too difficult to predictably and reliably apply. In support, the majority points to several cases in which it is impossible to reconcile the results that were reached.

First, the majority's new standard is neither more clear nor workable—only more difficult to satisfy. Second, although I agree that the decisions in these cases are irreconcilable, it is not because the standard is unworkable. Instead, it is because there have been a series of decisions by this court and the Court of Appeals that have misinterpreted and confounded the original relevancy standard for admission of plan evidence by misconstruing a single remark in *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989). In *Damewood*, the court commented that the evidence of the prior crimes in that case was "strikingly similar" to the charged crime. 245 Kan.

at 682. This was not a standard for admission, only a comment on the quality of the evidence at issue in that particular case. This language was subsequently further misinterpreted as requiring a "signature act." While this divergence from the original standard was occurring, the original standard was not overturned and, thus, remained good law. As a result, the more restrictive language co-existed with the original standard in our case law. Hence, it is not surprising that decisions on the admissibility of plan evidence are impossible to reconcile.

### The distortion of the similarity standard

In *Damewood*, the court explained that evidence of prior crimes to show plan is permissible under K.S.A. 60-455 where the evidence "is admitted to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes." 245 Kan. at 681-82. The basis for admission of such evidence under this rule, the court explained, "is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts." 245 Kan. at 682. That is the holding of the case—the standard by which the facts are measured to reach a decision. In applying that standard to the facts of the case before it, the court noted the evidence of the prior bad acts was "strikingly similar":

"In the present case, there was testimony through various State's witnesses that defendant denied all sexual activity with J.A. The testimony of M.S.R. of the events which occurred between him and the defendant in 1983 was strikingly similar to the method and plan the defendant used with J.A., even to the use of specific language and statements as well as specific actions of the defendant." 245 Kan. at 682.

That part of the *Damewood* decision describing the evidence as "strikingly similar" is not the legal principle upon which the decision is based, it is nothing more than a comment on the high degree of similarity shown by the evidence in that particular case. Certainly, evidence in any given case can meet or even exceed the standard of admissibility, without creating a higher bar for all cases that come after. That, however, is exactly what has happened.

The court's comment in *Damewood* was first misapplied as the standard for admissibility in *State v. Rucker*, 267 Kan. 816, 987 P.2d 1080 (1999). There, the court stated that the prior crimes evidence was admissible in *Damewood* because it " 'was strikingly similar to the method and plan' used in the later crime." *Rucker*, 267 Kan. at 828. The court then used the "strikingly similar" language to affirm the admission of plan evidence in that case: "[T]here are striking similarities between the alleged and prior offenses to warrant the admissibility of the testimony to prove plan. [Citations omitted.]" 267 Kan. at 828.

In *State v. Tiffany*, 267 Kan. 495, 986 P.2d 1064 (1999), a case decided the same day as *Rucker*, the court noted both the "strikingly similar" language used in *Damewood*, as well as language in *State v. Clements*, 252 Kan. 86, 90, 843 P.2d 679 (1992), in which the court upheld the admission of prior bad acts to prove plan because " '[t]he general method used by [the defendant] to entice young boys is similar enough to show a common approach that is tantamount to a plan.' " *Tiffany*, 267 Kan. at 502. The court observed that "the evidence admitted in the guilt phase was limited to a strikingly similar method of operation. Similar words were used to entice the victims into performing the requested acts, the victims were all about the same age, and the criminal conduct was performed in the same manner." 267 Kan. at 500. But, in affirming the admission of the evidence, the court used the language from *Clements* in concluding that " '[t]he general method used . . . is *similar enough* to show a common approach that is tantamount to a plan.' " (Emphasis added.) 267 Kan. at 502.

In *State v. Aldaba*, 29 Kan. App. 2d 184, 25 P.3d 149 (2001), the Court of Appeals noted that in *Damewood*, the perpetrator's method in each incident was " 'strikingly similar.' " 29 Kan. App. 2d at 190. The court further noted that in *Tiffany*:

"The Kansas Supreme Court upheld the admission of the evidence, finding a 'strikingly similar' method of operation. [Citations omitted.] Specifically, the court found it relevant that the defendant used similar words to entice the victims, that the victims were about the same age, and that the criminal conduct was performed in the same manner. (Citation omitted.)" *Aldaba*, 29 Kan. App. 2d at 190.

Based on this, the Court of Appeals concluded: "As in *Damewood* and *Tiffany*, the children's accounts are 'strikingly similar' here." 29 Kan. App. 2d at 190.

The term "signature" first appears in *State v. Tolson*, 274 Kan. 558, 56 P.3d 279 (2002). There, the court used the term "signature" to describe the quality of the evidence at issue in *Damewood*:

"The State relied on *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), in which the court described 'modus operandi' as the 'general method used by a defendant to perpetrate similar but totally unrelated crimes.' [Citation omitted.] Damewood's method was to interest boys in his beekeeping, which allowed him to be alone with them so that he could sexually molest them. The court found no error in the admission of the testimony of a young man who had been drawn into beekeeping by Damewood and then sexually abused several years before the victim of the charged crime became involved with Damewood. [Citation omitted.]

"In *Damewood*, there was a method of operation, *and it was so distinct as to be a 'signature.'* Damewood was being tried for arranging to spend time alone with a boy by involving the boy in his beekeeping activities and then sexually molesting him. Precisely the same pattern of conduct or method of operation was shown by the prior acts evidence to have been followed on a previous occasion.

"This case does not present such a clear picture." (Emphasis added.) *Tolson*, 274 Kan. at 563-64.

It must be noted that although the *Tolson* opinion states that *Damewood* affirmed the admission of evidence because "it was so distinct as to be a 'signature,'" the term "signature" was not used in *Damewood*.

By this point, it is obvious that the "strikingly similar" language used in *Damewood*, was morphing into the standard for admission of plan evidence. In 2003, in *State v. Davidson*, 31 Kan. App. 2d 372, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003), the "strikingly similar" language appeared in the syllabus of the Court of Appeals' opinion:

"Under the second theory for admission of K.S.A. 60-455 evidence to show plan, Kansas courts have admitted evidence of a prior crime when its method of commission was strikingly similar to the method of the charged crime."

"The record of this case is examined and it is held: Similarities between the prior crimes and the charged acts were not striking, and the admission of K.S.A. 60-455 evidence to show plan was improper." 31 Kan. App. 2d 372, Syl. ¶¶ 6, 7.

In its decision, the Court of Appeals relied on the "strikingly similar" language as the legal standard for admission of plan evidence: "We conclude this case lacks the 'striking' similarities that have marked our precedents. Under these circumstances, it was error for the district court to admit the K.S.A. 60-455 evidence to prove plan." 31 Kan. App. 2d at 384.

In addition, the appearance of the "strikingly similar" language in the syllabus is important, for the syllabus sets out the points of law decided in the case. See K.S.A. 20-111 (requiring opinions to include a syllabus setting out "the points decided in the case"); K.S.A. 60-2106 (b) (appellate opinions "shall contain a syllabus of the points of law decided").

In *State v. Jones*, 277 Kan. 413, 85 P.3d 1226 (2004), this court noted the divergent standards in the case law for the degree of similarity required for admission of prior crimes evidence to prove plan under K.S.A. 60-455. The court noted the "strikingly similar" and "signature" language used in *Damewood*, *Tiffany*, *Aldaba*, and *Tolson*, and the "similar enough to show a common approach that is tantamount to a plan" language used in *Clements*. *Jones*, 277 Kan. at 421. The court, however, did not resolve the confusion. Instead, the court held that the facts of the case failed to meet "either standard of similarity." 277 Kan. at 421. In using that language, the court appeared to recognize the "strikingly similar" and "signature" language as a legal standard of admissibility.

Not surprisingly, then, in *State v. Kackley*, 32 Kan. App. 2d 927, 92 P.3d 1128, *rev. denied* 278 Kan. 849 (2004), the "strikingly similar" and "signature" language was recognized in the syllabus as the legal standard for admission for prior crimes evidence to prove plan:

"K.S.A. 60-455 evidence may be admissible in sex crime cases where the details of the plan or modus operandi for the prior crime and the crime for which the defendant is on trial are 'strikingly similar' or reflect a method of operation so distinctive as to be a 'signature.' " 32 Kan. App. 2d 927, Syl. ¶ 3.

Most recently, in *State v. Dayhuff*, 37 Kan. App. 2d 779, 158 P.3d 330 (2007), the Court of Appeals noted the divergent standards and held that "strikingly similar"/"signature act" was the legal standard for admission of prior crimes evidence to prove plan:

"Our Supreme Court has never clarified whether the standard is 'signature act,' 'strikingly similar,' or 'similar enough' when determining whether the prior crimes evidence is relevant to show plan under K.S.A. 60-455. See *Jones*, 277 Kan. at 423. Nevertheless, since *Clements* our Supreme Court and this court have more recently applied the 'strikingly similar' or the 'signature act' standard when determining whether prior crimes evidence is relevant to show plan; see *Rucker*, 267 Kan. at 826-28; *Tiffany*, 267 Kan. at 500; *Kackley*, 32 Kan. App. 2d at 932; *Davidson*, 31 Kan. App. 2d at 381; and *Aldaba*, 29 Kan. App. 2d at 190. Our Supreme Court has never defined the term 'similar enough,' and *Clements* provides little guidance on the analysis for such a standard. Based on how our Supreme Court and this court have been treating the issue, a 'strikingly similar' or a 'signature act' analysis is the appropriate standard for this case.

"Because there was insufficient evidence presented in this case to show a distinct mode of operation that was 'strikingly similar' or a 'signature act,' we conclude that the trial court erred in admitting evidence of Dayhuff's prior crimes under the plan exception of K.S.A. 60-455." *Dayhuff*, 37 Kan. App. 2d at 793-94.

This brings us to where we are today: with a new, much more restrictive, legal standard of admissibility of prior crimes evidence to prove plan than we had before, a result that occurred without any deliberate or conscious decision to abandon the original similarity standard. This is not how legal principles should develop.

We addressed the error of misconstruing language commenting on the facts of the case as the legal standard in *Trustees of The United Methodist Church v. Cogswell*, 205 Kan. 847, 473 P.2d 1 (1970). *Cogswell* concerned the tax exemption for property used "exclusively" for religious purposes under Article 11, § 1 of the Kansas Constitution. The trial court, relying on prior appellate decisions using the words "directly" and "immediately" in conjunction with "exclusively" when discussing the religious purposes tax exemption, held that property is exempt only if it is used directly, immediately, and exclusively for religious purposes. Because the property at issue was used only indirectly for such purposes, the trial court held it did not qualify for exemption.

On appeal, this court reversed. 205 Kan. at 861. The court noted that the decisions the trial court relied on "tend[ed] upon first blush to support the position of the trial court—that the provisions of the constitution and the statute here in question exempt from taxation only such property as it used 'directly, immediately and exclusively[.]' " 205 Kan. at 853. However, the court held that the

word "exclusively" had been improperly narrowed by cases construing it to mean only that which is also used "directly" and "immediately." 205 Kan. 847, Syl. ¶ 7. To figure out how that happened, the court traced the source of the words "directly" and "immediately" in the case law and found that in the first case in which they appeared, "directly" and "immediately" were used to describe the facts of the case and did not constitute the rule of law applied by the court:

"In the opinion it was stated the facts disclose 'the property was used more or less mediately or remotely for educational purposes. But none of it was used exclusively, directly, and immediately for such purposes.' [Citation omitted.] A careful reading of the opinion will indicate the terms 'directly' and 'immediately' used in the opinion were explanatory and designed to be descriptive of the factual situation. It is clear in the opinion the rule applied by the court to exempt property from taxation was that it must be used 'exclusively for educational purposes.' " 205 Kan. at 855.

The Cogswell court further stated:

"Where prior decisions have used the words 'directly' and 'immediately,' it cannot be said that their application was necessarily required by the constitution as a basis for the decision. The words were explanatory or descriptive of the facts rather than controlling in the decision-making process, and their use must be considered in the light of the facts in the particular case in which they appear. To interpret 'exclusively' to mean only that which is also 'directly' and 'immediately' used for a tax exempt purpose is unrealistic and would in substance add a new dimension to Article 11, Section 1 of the Kansas constitution limiting the tax exemption guaranteed by the constitution." 205 Kan. at 858.

See also *State v. Young,* 220 Kan. 541, 554, 552 P.2d 905 (1976) (quoting *Matter of Aaron D.,* 30 A.D.2d 183, 189, 290 N.Y.S.2d 935 [1968] [Steuer, J., dissenting]; in a case concerning voluntariness of a statement, the dissent bemoaned the " 'tendency to pare away the limits of what is voluntary by successive interpretations of prior interpretations' " and the evolution of the law whereby " 'little by little circumstances in a particular case which are held to show a lack of voluntary admission are further extended in the next one' ").

That is exactly what has occurred with the language "strikingly similar." In using those words, the court in *Damewood* was merely describing the fact that the circumstances of that case showed a

high level of similarity—higher than the standard of similarity required for admission. In seizing upon those words without recognizing that they were never intended to establish a higher standard of similarity than that applied by the court in *Damewood*, our courts erred in measuring the admissibility of the evidence at issue against those words, and they ended up morphing into *the* standard. This is not how precedent or legal principals should develop, because then the law changes without a deliberate, conscious decision as to whether it should be changed. In none of these cases was there a fully argued and deliberate, conscious, reasoned decision to abandon the original similarity standard in favor of the higher standard imposed by requiring "striking similarity" or "signature act." We should not allow our precedent to develop in this fashion.

In summary, I agree with the majority that there has been confusion among Kansas appellate decisions in these cases. However, I disagree that this has been because the similarity standard was too low, or, as the majority states, did not have enough "meat on its bones" to allow courts to reliably draw the line between propensity evidence and plan evidence. Instead, the confusion is the result of the erroneous evolution of a higher standard of admissibility that coexisted with the original standard. Hence, it is not surprising that decisions on the admissibility of plan evidence are impossible to reconcile.

Interestingly, the similarity standard for admissibility of prior crimes evidence to show identity has not warped over the years and is being applied with little difficulty. This shows the similarity standard is not unworkable, it just needs to be uniform. On the need for uniformity, I agree with the majority. But I see no reason to abandon the original standard set out in *Damewood*. Accordingly, I would hold that prior crimes evidence is relevant to prove plan where the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. 245 Kan. at 682. This was the standard as it existed before

the deconstruction began after *Damewood*. Further, I would hold that, under that standard, the trial court did not err in allowing the admission of the evidence of prior crimes to prove plan.