IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,604

STATE OF KANSAS,
*Appellee*,

v.

TERRY EUGENE ROSS JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 22-3202(1) and K.S.A. 22-3203 permit a district court to consolidate multiple cases together for trial if, among other things, the crimes charged constitute two or more acts or transactions connected together or constitute parts of a common scheme or plan.

2.

Separate crimes may be considered part of a common scheme or plan when they are related together in some way. The crimes need not necessarily be in close temporal proximity with each other, nor do they need to be part of one discrete event, so long as they are somehow connected together in pursuit of a common goal.

3.

Because K.S.A. 22-3202(1) provides that a district court "may" join charges together for trial, appellate courts review the district court's ultimate decision—after assessing whether one of the statutory conditions for joinder was satisfied—for abuse of discretion. Because appellate courts will have already assessed the legal and factual bases for the district court's joinder by this point, the only remaining question is whether no

reasonable person would have joined the charges together for trial. The party alleging error bears the burden of establishing that the district court abused its discretion.

4.

In order to preserve an evidentiary error under K.S.A. 60-261 for appellate review, a party must both timely object to the error and request a valid corrective measure from the district court. The failure to do the latter results in the functional abandonment of the complaint.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 14, 2024. Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Oral argument held January 29, 2025. Opinion filed June 13, 2025. Judgment of the Court of Appeals reversing the district court on the issues subject to review is reversed. Judgment of the district court is affirmed on the issues subject to review, and the case is remanded.

*Jacob Nowak*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Julie A. Koon*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: The State of Kansas petitioned this court for review after a panel of the Kansas Court of Appeals reversed Terry Eugene Ross Jr.'s numerous convictions arising out of consolidated cases. Ross conditionally cross-petitioned for review of the panel's conclusion that an instance of prosecutorial error was individually harmless. He also argues that the panel erred by declining to consider whether the State's inadvertent violation of the district court's order in limine was individually harmless.

2

We hold the district court did not err in consolidating Ross' cases for trial, so we reverse the panel in that regard. We further hold the prosecutor did not err in opening statements and that Ross failed to preserve a challenge to the State's inadvertent violation of the district court's order in limine. Finally, we hold the cumulative error doctrine does not afford Ross relief. Our decision leaves untouched two convictions unmentioned by the State's petition for review, which the panel reversed as mutually exclusive. We remand the matter to the district court for further proceedings on those two convictions.

FACTS AND PROCEDURAL HISTORY

A.R. married Ross in 2016. They had a daughter together, A.D.R., in January 2019. A.R. also had two older daughters from a previous relationship: H.L., born in January 2005, and D.L., born in October 2007. During the first half of 2019, all five lived together in a house in Wichita. A.R. worked the evening shift as a supervisor at the United States Postal Service distribution center. Ross worked as a fitness instructor at Planet Fitness until he was fired sometime in early May of 2019.

A.R. and Ross' relationship was turbulent. Ross frequently texted A.R. when they were apart—sometimes, in a "creepy" way that made her think he was keeping tabs on her movements. Keeping tabs would not have been difficult for Ross, since he set up camera surveillance throughout the house, and even outside the house, all accessible to him through his phone. A.R. knew about these cameras. Ross also showed H.L. how he could access the cameras on his phone. A.R. told her work supervisor about some of her conversations with Ross because she was afraid of her husband.

During this time, verbal fights between Ross and A.R. eventually became physical. On April 30, 2019, A.R. and Ross argued while watching a movie. Ross became upset because A.R. threw some food away. A.R. claimed that Ross grabbed her wrist to stop her from dumping food in the sink, and when she tried to pull her hand free, she hit

3

herself in the face, fell backwards, hit the counter, and blacked out. In response, Ross fired his gun into the floor near A.R.'s head to wake her up. Both H.L. and D.L., who were downstairs at the time, heard the gunshot. A.R. woke up and tried to run away, but Ross grabbed the hood of her sweatshirt, choking her. A.R. slipped on her own blood and hit her head on the floor, where she apparently blacked out again. The entire episode left A.R. with a black eye, a cut on her nose, a "busted" lip, a swollen left cheek, and a bruise on her right arm. Ross then called both H.L. and D.L. to come upstairs to clean up their mother's blood.

During another argument sometime within the next couple of weeks, Ross threatened to take A.D.R. away if A.R. did not stay with him, a threat Ross had used before. Once, when A.R. went to the kitchen during an argument, Ross approached her from behind, put a knife to her throat, and said he was going to commit a murder-suicide. He then put the knife down and went back to bed.

Ross also got into an argument with D.L. around this time, accusing her of not taking care of A.D.R. and slapping her with an open hand. The slap left a mark that was visible as of May 17, 2019.

On May 17, H.L. graduated from eighth grade. The morning was "volatile," with Ross threatening to rip A.R.'s dress off and saying she would not make it to the graduation. That same day, A.R. asked her supervisor to "send help" to her address if she did not make it to work that evening. When A.R. was late to work that evening, her supervisor informed a postal inspector, who called 911.

The police went to the family's house. A.R.—who was bruised and had a black eye—was reluctant to speak with law enforcement because she was worried Ross was monitoring her through the security cameras in the house. She also worried the police would tell Ross what she had told them, and Ross would hurt her. Nevertheless, A.R.

4

described Ross "being in control of things" to ensure that A.R. kept up a normal appearance to the outside so the police would not become involved.

During separate interviews, H.L. and D.L. independently disclosed that Ross had touched them sexually, as discussed in more detail below. H.L. also described Ross' physical violence against her mother; she also said that Ross had slapped both herself and D.L. in recent days. D.L. reported similar violent incidents and further explained that Ross threatened to "kill" and "beat" her, H.L., and A.R. if they "snitched to the police."

The police were unable to find Ross that night. After a brief separation, in which A.R. took H.L. and D.L. to live with family out of state, A.R. went back to the house and resumed living with Ross. During this time, A.R. established a code with a coworker: when A.R. texted that she needed an ibuprofen, the coworker was to send the police to her house.

On July 2, Ross and A.R. got into an argument while watching a movie. During the argument, Ross became "paranoid" that the volume of the argument would attract the attention of the police. Ross again suggested that it was time for a murder-suicide, so A.R. sent the code word to her coworker. Her coworker then called the police.

During the fight, Ross grabbed A.R.'s wrists, led her down to the basement, and told her to lie down on the floor on her stomach while he grabbed an orange extension cord. Ross then sat on A.R.'s back, handcuffed and hogtied her wrists and ankles together, and began to strangle her with the extension cord. Though A. R. passed in and out of consciousness during her strangulation, she heard Ross screaming that they were going to die. When Ross fell backwards, A.R. made her escape. A.R. had injuries to her wrists, neck, and ankles from this fight.

The police arrived and arrested Ross, whom they found hiding in the rafters of the garage.

A.R. obtained a protection from abuse (PFA) order after Ross' arrest. In spite of that order, Ross continued to call A.R. while incarcerated.

*H.L. and D.L.'s Allegations*

H.L. described the violence in the home to a child specialist supervisor with the Department for Children and Families. While discussing physical discipline, H.L. disclosed that Ross had threatened to hurt her; she then brought up inappropriate sexual touching.

According to H.L., Ross began touching her when she was about 12 years old. Sometimes D.L. was home when Ross touched her, but usually she was alone with Ross. Ross initially touched H.L. outside the clothes, but progressed to touching her under her clothes, placing his mouth on her, and having her touch his penis. Ross would tell H.L. that what they were doing was normal and that it was not hurting her; he also threatened to punish H.L. if she told anyone.

H.L. described one set of events involving over the clothes touching when she was in sixth grade, one event in December 2018 or January 2019 involving oral sex and penetration with the penis and fingers, and one event in May 2019, involving oral sex and penile penetration. Because H.L.'s 14th birthday fell in January 2019, the events she described in the second incident could have occurred before or after she turned 14. To place this discrepancy in the jury's hands, the State ultimately charged the second incident as two crimes in the alternative.

D.L. reported that, when nobody else was around, Ross sometimes touched her sexually over her clothes. She also said that Ross threatened to kill or hurt her if she disclosed his touching or his violence against her mother. Because she feared Ross, D.L. told police about Ross' actions before telling either her mother or sister.

*District Court Proceedings*

In five separate cases, the State charged Ross with 49 crimes. Three cases—2019-CR-1959, 2019-CR-2068, and 2019-CR-2530—charged Ross with a collective 31 counts of violating a protection order. 2019-CR-1859 contained 10 counts listing Ross' alleged domestic violence crimes against A.R. Finally, 2019-CR-2036 contained eight counts of Ross' alleged sex crimes against H.L. and D.L.

The district court ultimately consolidated the cases for trial. The district court also granted Ross' pretrial motion in limine to preclude discussion of his prior crimes.

As discussed below, the State accidentally played part of an unredacted recording of a 911 call near the beginning of trial. A.R., H.L., and D.L. testified about both the sex charges and the domestic violence charges, and Ross' acts of physical violence or threats against all three played a major role in the State's case. In particular, the evidence suggested that Ross threatened violence to both D.L. and H.L. if they disclosed his sex acts—and that they were aware of his physical violence against their mother.

Ross testified as well. He told a markedly different story, broadly denying the allegations and blaming A.R.'s manipulation for the girls' sex crimes accusations.

The jury acquitted Ross of one count of aggravated assault, one count of unlawful discharge of a firearm, one count of aggravated kidnapping, one count of aggravated domestic battery, and one count of criminal threat. Jurors found him guilty of the

7

remaining charges, including the alternatively charged counts of aggravated criminal sodomy and criminal sodomy, counts two and three of 19-CR-2036.

After the verdict, both Ross and his counsel moved for a new trial. Neither motion mentioned the State's inadvertent partial publication of the unredacted 911 call, and Ross' counsel did not discuss it in arguing the motions. After denying the motions, the district court sentenced Ross to three consecutive life sentences with a combined total of 75 years without the possibility of parole, followed by sentences of a collective 346 months for his on-grid crimes. Ross appealed.

*Appellate Proceedings*

A panel of the Kansas Court of Appeals reversed Ross' convictions on appeal. *State v. Ross*, No. 125,604, 2024 WL 2991176, at *1 (Kan. App. 2024) (unpublished opinion). The panel found errors in the district court's decision to consolidate Ross' cases for trial—which the panel considered individually reversible—along with one instance of individually harmless prosecutorial error. *Ross*, 2024 WL 2991176, at *19, *21-23, *28-29. The panel also concluded that the jury's convictions on both alternatively charged counts two and three in 19-CR-2036 independently warranted reversal of those convictions. 2024 WL 2991176, at *28. Finally, the panel concluded that Ross' convictions should also be reversed for cumulative error. 2024 WL 2991176, at *28-29. The State petitioned this court for review, and Ross conditionally cross-petitioned.

ANALYSIS

*The district court did not err in consolidating Ross' cases for trial.*

The State first challenges the panel's conclusion that the district court erred in consolidating Ross' five pending cases for trial. Because we hold the district court

8

correctly concluded the five cases were part of a common scheme or plan, we reverse the panel's decision on this point.

*Standard of review*

We apply a three-step review over a district court's decision to consolidate multiple cases for trial:

"'First, the court considers whether K.S.A. 22-3203 permitted consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and the appellate court reviews the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. Second, because K.S.A. 22-3202 provides that charges 'may' be joined, a district court retains discretion to deny a request to consolidate even if a statutory condition is met. This decision is reviewed for an abuse of discretion. Finally, if an error occurred in the preceding steps, the appellate court considers whether the error resulted in prejudice, i.e*., whether it affected a party's substantial rights.'" *State v. Smith-Parker*, 301 Kan. 132, 156, 340 P.3d 485 (2014) (quoting *State v. Hurd,* 298 Kan. 555, Syl. ¶ 1, 316 P.3d 696 [2013]), *disapproved of on other grounds by State v. Waldschmidt*, 318 Kan. 633, 546 P.3d 716 (2024).

*Additional facts*

In five separate cases, the State charged Ross with 49 crimes. Broadly, these included domestic violence crimes against A.R., sexual violence crimes against H.L. and D.L., and violations of protection orders for phone calls made to A.R.

The State moved to consolidate the cases for trial, arguing that Ross' crimes were of the same or similar character and that they constituted part of a common scheme or

9

plan. At a pretrial hearing on the State's motion, the district court recognized that, although the parties were not presenting evidence, their motions proffered facts. Ross' counsel conceded that the three cases for violating a protective order could be consolidated for trial, and the district court ordered their consolidation. As to the remaining two cases, the prosecutor proffered that all of the charged crimes took place in the house and involved Ross' physical, emotional, or sexual abuse of A.R. or her children, including threatened violence. The prosecutor further suggested that additional evidence might be admissible under K.S.A. 2021 Supp. 60-455 to show that Ross' domestic violence against A.R. was "not just physical abuse" but was "sexual abuse and it's psychological abuse." And the prosecutor pointed out that both sets of crimes mostly involved the same witnesses and that the girls disclosed Ross' sex crimes against themselves during the official investigation of Ross' violence against their mother.

In arguing that the crimes charged in the different cases comprised a common scheme or plan, the prosecutor argued that Ross' crimes shared a common goal: to "dominate and control the women in this household." Ultimately, the prosecutor suggested, Ross' plan was "to control the women in the household, to be number one, to be in charge, to make them feel subordinate, and for those reasons joinder is appropriate as a common scheme or plan." And the prosecutor tied the girls' experiences with Ross' violence against their mother—including an instance where Ross made them clean up her blood after a fight—to Ross' threats against them if they disclosed his sexual abuse.

The district court later granted the State's motion and ordered consolidation. In its written ruling, the district court cited nine similarities between the cases suggesting a "same or similar character":

"1. The mode of trial for all cases would be a trial by jury.

"2. Fifty of the 51 crimes charged in the five cases are person crimes.

10

"3. The charges in 19CR2036 and 19CR1859 require the same nature and type evidence, principally the testimony of alleged victims. The three misdemeanor cases would include additional evidence of recorded calls. Evidence in 19CR2036 would likely include testimony regarding a sexual assault examination.

"4. The principle [*sic*] witnesses in all five cases are [A.R.], [H.L.] and [D.L.] They are mother and daughters. They are wife and stepdaughters to defendant. They are familiar to defendant, and each other. None are strangers. They resided together in the same household. All three alleged victims will be witnesses in the two felony cases. As for all five cases, [A.R.] and a minimum of four law enforcement officers will be common witnesses. Detective Patricia Brock is the Affiant for the Affidavit of Probable Cause in 19CR1859, 19CR1959, 19CR2068 and 19CR2530. Detective LaTavia Klumpp is the Affiant for the Affidavit of Probable Cause in 19CR2036.

"5. Except for Count One in 19CR2036, all other 50 counts in the five cases occurred within an eight-month period between January and August of 2019. Including Count One of 19CR2036, all 51 counts allegedly occurred within a three-year period. During this period, defendant demonstrated a consistent, interrelated and sustained pattern of alleged criminal conduct and victimization to the three persons closest to him and living under the same roof.

"6. All five cases allegedly occurred in Wichita, Kansas. Both 19CR2036 and 19CR1859 occurred at [the family residence]. Presumably, the 33 jail calls were to [A.R.]'s mobile phone, some of which were likely directed to [A.R.] while at the [family] address. The defense cites *State v. Lancaster,* No. 103,087, unpublished opinion (July 15, 2011) for the proposition that 'the mere presence in a single home of evidence of otherwise unrelated crimes does not provide a sufficient basis for a single trial.' However, the *Lancaster* court was clear the 'only connection' between the drugs and paraphernalia and the 20 photographs of child pornography was that the evidence was found in the same house. Here, there are considerably more connections between the two felonies and the set of three misdemeanors.

"7. In 19CR2036 and 19CR1859, the alleged crimes involve physical acts of violence against [A.R.], [H.L.] and [D.L.] There are additionally, verbal elements in the form of spoken threats of violence or negative consequences. Of course, all three misdemeanor cases involve verbal communication.

"8. Defendant was in the county jail due to the two felony cases when he allegedly called [A.R.] The three misdemeanor cases principally stem from defendant calling [A.R.] from jail contrary to protective orders in those two felony cases.

"9. All five cases allege and involve acts of physical, emotional, or sexual abuse, as the defendant intimidated, manipulated and exercised control over the three females closest to him. This is the most distinct and 'common evidentiary thread' woven through the fabric of all five cases."

The district court also concluded the State had established a "common scheme or plan to manipulate and control the women in his home," finding the following facts:

"1. *Physical harm (cases and counts involving physical harm to [A.R.], [H.L.] and [D.L.]):* 19CR2036 and 19CR1859: The facts supporting the following charges— Aggravated Indecent Liberties with a Child, Aggravated Criminal Sodomy (four counts), Criminal Sodomy (two counts), Battery, Aggravated Domestic Battery (two counts), Aggravated Assault, Domestic Battery and Aggravated Kidnapping.

"2. *Physical and emotional threats:* 19CR1859—defendant telling [A.R.], 'I'm going to kill you. In fact, let's do a murder suicide. You stab me, I'll shoot you.'; defendant shooting a gun at the floor near where [A.R.] was lying down in a fetal position; defendant holding a knife to [A.R.]'s throat; 19CR2036—defendant telling [H.L.] multiple times that if she snitched, he could beat the crap out of her; defendant slapping [D.L.] across her face because she was not helping with the baby; defendant telling [D.L.] to 'relax or else'; defendant telling [D.L.] that if she told about the abuse, he would send them away.

12

"3. *Emotionally disparaging comments*: 19CR1859—defendant telling [A.R.] what a bad parent she was.

"4. *Intimidating and manipulative statements and actions:* 19CR1859—defendant threatening to rip off [A.R.]'s dress (worn for [H.L.]'s graduation ceremony); 19CR2036—defendant suggesting to [H.L.] that putting his penis in her vagina was okay because he 'just wanted to do it for two minutes.' 19CR2036—defendant rubbing [D.L.]'s butt, apologizing to her, and then hugging her, telling [D.L.] that he loved her; defendant allegedly committing acts of physical abuse while [D.L.] was present, witnessing everything; defendant making [H.L.] and [D.L.] clean up [A.R.]'s blood in the kitchen; 19CR2068—Contrary to protective orders, defendant telling [A.R.] in a jail call that he loves her; defendant discussing with [A.R.] how long he will be in prison; defendant telling [A.R.] that the police are trying to break them up and to pit defendant and [A.R.] against each other; defendant telling [A.R.] that despite this, she needs to keep her end of the deal and put money on defendant's books; 19CR2530—defendant telling [A.R.] he loves her despite [A.R.] telling defendant she hates him; defendant telling [A.R.] that her reporting defendant forcefully raped her resulted in defendant being fired from his job; defendant telling [A.R.] in the context of [A.R.] filing a divorce, that defendant cannot be forced to testify against her—mentioning pictures of her from June 2017 and the threesome."

Finally, the district court concluded "the probative value of consolidating the five cases outweighs any undue or unfair prejudicial effect."

*Discussion*

K.S.A. 22-3203 authorizes a district court to consolidate multiple complaints against a single defendant for trial "if the crimes could have been joined in a single complaint, information or indictment." Under K.S.A. 22-3202(1):

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged,

13

whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

The State challenges the panel's conclusions that Ross' crimes (1) were not of the same or similar character and (2) did not constitute part of a common scheme or plan. The State claims the panel failed to defer to the district court's findings of fact and reweighed the evidence. The State also argues that the panel impermissibly increased the State's evidentiary burden to show that Ross' acts were part of a common scheme.

*Threshold matter: The panel did not "decline[] to scour the record to uncover support for the State's unsupported factual assertions."*

Ross argues the State's appellate brief essentially copied the trial prosecutor's motion to consolidate and thus failed to provide pinpoint record citations to support its argument, as required by Kansas Supreme Court Rule 6.03(a)(3) (2025 Kan. S. Ct. R. at 37). He suggests the panel "adopted" his argument, "held the State failed to provide any record citation to support its argument," and "declined to scour [the] record to uncover support for the State's unsupported factual assertions." Ross argues the panel's alleged refusal to "scour" the record was discretionary and asks us to hold that the panel did not err in presuming that the State's factual statements were unsupported in the record.

But the panel did no such thing. While the panel agreed the State failed to support its assertions about a common scheme or plan with pinpoint citations, the panel did not exercise a discretionary choice to "presume[]" the record contained no support for the State's claims. Instead, it wrote, "*From the record*, there is no direct or circumstantial evidence that Ross had a scheme or plan to manipulate and control the women in his home." (Emphasis added.) *Ross*, 2024 WL 2991176, at *15. Consequently, we do not review the panel's decision solely for abuse of discretion.

14

*The panel incorrectly determined that Ross' crimes were not part of a common scheme or plan.*

As discussed, the district court concluded that all three sets of crimes (1) were the same or similar character and (2) were part of a common scheme or plan. The panel reversed the district court on both points. Although the State petitioned for review of both, we focus only on the second.

Before the district court, the State clarified that it based its common scheme or plan theory on the "common event or goal" criteria set forth in *State v. Donaldson*, 279 Kan. 694, 700, 112 P.3d 99 (2005), and discussed in *State v. Coburn*, 38 Kan. App. 2d 1036, 1048, 176 P.3d 203 (2008). As the prosecutor put it, Ross' threats "demonstrate his plan to dominate and control the women in this household."

Ross did not dispute the district court's findings of fact before the panel, and the panel acknowledged they "are supported by substantial competent evidence in the record." *Ross*, 2024 WL 2991176, at *10. But then the panel's analysis took a wrong turn.

Instead of addressing K.S.A. 22-3202(1)'s plain language, the panel embarked on a lengthy discussion of cases applying the statute. *Ross*, 2024 WL 2991176, at *11-14. The panel also reasoned that two or more crimes could be part of a common scheme if one crime was "part of a scheme to commit another crime," but concluded that Ross did not commit the domestic violence crimes against A.R. "to further his plan to gain access to her daughters." 2024 WL 2991176, at *14. The panel then discounted the State's argument that all the charged crimes were "'part of his common scheme and plan to control and manipulate the women in his household.'" 2024 WL 2991176, at *15. Instead, the panel accepted Ross' contention that "being controlling or manipulative" is not a scheme or plan but is instead "negative character traits or qualities"; the panel also

15

concluded that "the State's assertion about Ross' course of conduct . . . is a loose assertion not supported by evidence." 2024 WL 2991176, at *15. Then, after referencing *State v. Prine*, 287 Kan. 713, 737, 200 P.3d 1 (2009) (*Prine I*), the panel held that the State failed to present "any evidence from a psychiatrist or other expert witness [who] testified that sexual abuse is related to domestic violence through a mental illness in common" and failed to show "a connection between sexual abuse and domestic violence either in general or in Ross' case"; instead, the panel viewed the State's "broad-brush contentions" as arguments of counsel unsupported by evidence. 2024 WL 2991176, at *15-16.

But the State did not argue that Ross was "controlling or manipulative" as mere character traits: it argued consistently—and the district court found—that Ross' pattern of behavior around the women in his household formed one continuing saga of domination and control. While not a "plan" in the sense of any one discrete crime, the trial record was replete with evidence of Ross' ongoing enterprise of intimidating, dominating, and controlling A.R., D.L., and H.L. The evidence suggests that Ross employed cameras to transform the residence into his personal reality show, then wielded power over A.R. and her children through both threats and *acts* of physical violence. Further, H.L. and D.L.'s testimony demonstrates that Ross backed up his sex crimes with overt threats of physical violence and with the knowledge of Ross' violent history with their mother. While Ross apparently sometimes used grooming language in committing the sex crimes (after isolating D.L. or H.L. from the rest of the household), both girls testified that Ross threatened retribution for snitching—and at least once, that H.L. tried to push him off her, but was unable to. Thus, in distilling this pattern down to "negative character traits or qualities," the panel simply—and improperly—reweighed the evidence.

The panel also reweighed the evidence in the guise of imposing a new evidentiary requirement: psychiatric or other expert testimony linking sexual abuse to domestic violence "through a mental illness in common." *Ross*, 2024 WL 2991176, at *15. The State's theory was not that Ross was simply a pedophile, but that all his abusive acts

16

centered around the common goal of dominating and controlling the women in his household. Neither the district court nor the jury required expert testimony to assess this claim. And while Ross himself never explicitly described his conduct as a plan to "manipulate and control the women in his home," plenty of circumstantial evidence supported the district court's finding that the crimes charged in all five cases orbited this common goal.

The panel also cited some cases to suggest that, as a matter of law, a "plan or scheme" must be a much more discrete or concentrated event than the months (or, in one count, years) of criminal activity charged here. But Kansas appellate courts have not always required such a temporally or conceptually limited "plan or scheme." For instance, in *State v. Alcorn*, No. 106,569, 2012 WL 4121117, at *1 (Kan. App. 2012) (unpublished opinion), the district court consolidated three separate cases for trial: one involving stalking and violations of a protective order, a second involving stalking, violation of a protective order, domestic battery, criminal trespass, and criminal damage to property, and a third involving further violations of a protective order. On appeal, after concluding that the crimes were of the same or similar character—the same victim was named in all counts but one, and that count named his mother—the panel also assessed whether the charges were "connected together" via a common event or goal:

> "Here, Case No. 09-CR-567 involved two counts of stalking and two counts of violating a protective order for incidents between July 2 and 12, 2009. Case No. 09-CR-725 involved one count of stalking, one count of violating a protective order, one count of domestic battery, one count of criminal trespass, and one count of criminal damage to property for incidents occurring September 6, 2009. Case No. 10-CR-588 involved nine counts of stalking and eight counts of violating a protective order for incidents from November 2009 to July 2010. Accordingly, we find that the crimes in each of the cases are connected together through the tumultuous relationship between Alcorn and May.

"All of the charges stem from the common event of May and Weaver obtaining protective orders against Alcorn. The criminal trespass charge stemmed from her violating a protective order that prohibited her from entering May's home. The domestic battery and criminal damage to property charges stemmed from the same incident in September 2009. May testified that Alcorn broke his cell phone and scratched him when he tried to call the police, presumably to report her for violating the protective order. Thus, we also find that the charges were sufficiently similar such that they could have been charged in the same complaint under K.S.A. 22-3202(1)." 2012 WL 4121117, at *6.

In *State v. Robinson*, 303 Kan. 11, 204, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017), we considered the meaning of "common scheme or course of conduct" under K.S.A. 21-3439(a)(6) (Torrence), now K.S.A. 21-5401(a)(6), the capital murder statute. Robinson was charged with crimes related to six murders of women over—"killings that constituted parts of a common scheme or course of conduct whereby Robinson would lure women to Johnson County with offers of employment, travel, and other benefits; exploit them sexually, financially, or otherwise; kill them and dispose of their bodies in a similar manner; and engage in various acts of fraud, deceit, and manipulation to conceal his crimes." *Robinson*, 303 Kan. at 23. Robinson argued that his crimes were not part of a "common scheme or course of conduct" because he did not commit his crimes over a "short span of time." *Robinson*, 303 Kan. at 202-03. Robinson analogized the language of K.S.A. 21-3439(a)(6) to the "common scheme or plan" language from K.S.A. 22-3202(1), *inter alia Robinson*, 303 Kan. at 203-04. But we rejected his claim:

"Robinson relies on authority construing Kansas' joinder statute, which allows the State to join offenses in a single complaint under a variety of circumstances, including where the crimes are based on 'two or more acts or transactions connected together or constituting parts of a common scheme or plan,' K.S.A. 22-3202(1), to argue the phrase 'common scheme' requires the crimes be motivated by a single identifiable goal. However, neither [*State v. Woods*, 250 Kan. 109, 117-18, 825 P.2d 514 (1992)] nor [*State v. Hanks,* 236 Kan. 524, 533, 694 P.2d 407 (1985)] *held that a single identifiable goal or*

18

*motive of the defendant was a prerequisite to finding a common scheme*. In fact, *Hanks* identifies a number of other characteristics such as the same victim, the same jurisdiction, and similar acts and crimes to further its conclusion that the crimes were related.

"While we have not expressly defined 'common scheme or course of conduct' under K.S.A. 21-3439(a)(6), we have examined its meaning. . . .

. . . .

"Contrary to Robinson's attempts to narrow and compartmentalize the meaning and scope of a common scheme or course of conduct under K.S.A. 21-3439(a)(6), in [*State v. Gleason,* 299 Kan. 1127, 329 P.3d 1102 (2014), *rev'd on other grounds sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016)], we again required only that the multiple murders be related to one another in some way.

"Moreover, in reviewing the evidence in *Gleason,* we did not point to any particular characteristics of the murders, i.e.*,* common motive, short span of time, or similar modus operandi, in concluding that a rational jury could have found the murders sufficiently related to satisfy the statutory element. In fact, we rejected defendant's argument that the two murderers must have conspired to commit both murders for them to be sufficiently related to establish a common scheme or course of conduct.

"Robinson fails to show a legal definition of the terms that would justify taking the issue from the jury. The State presented ample evidence that Robinson lured his victims with promises of financial gain, employment, or travel; exploited them sexually or financially; used similar methods to murder and dispose of their bodies; and used deception to conceal the crimes, including phony letters and e-mails to victims' friends and family members. While no two of the victims or their murders were identical, they are not required to be. *Simply put, there was ample evidence from which the jurors could have found that all of the murders were related to one another in some way and therefore part of a common scheme or course of conduct.* [Citations omitted.]" (Emphasis added.) *Robinson*, 303 Kan. at 204-06.

While K.S.A. 21-3439(a)(6) refers to "connected together or constituting parts of a common scheme or course of conduct" and K.S.A. 22-3202(1) uses "connected together or constituting parts of a common scheme or plan," we view the difference as substantively irrelevant to the question before us. Admittedly, one statute defines capital murder, while the other simply discusses when crimes may be joined together for trial— but because the definition of capital murder *incorporates* a conceptual joining of separate killings within one charge, the two statutes are sufficiently similar in both purpose and language to warrant comparison. E.g., *State v. Pepper*, 317 Kan. 770, 778, 539 P.3d 203 (2023) (identical language in different statutes on the same subject results in identical interpretation, absent additional context suggesting a different construction was intended). And viewed through the lens of whether Ross' crimes were "related to one another in some way," the district court again had ample support in the record.

Thus, even putting aside the panel's reweighing of the evidence, we disagree with its overly narrow view of the phrase "common scheme or plan." While not as specific a goal as other hypothetical objectives we could formulate, Ross' actions here fit within the broader goal identified by the district court: "manipulate and control the women in his home." See, e.g., *State v. Woods*, 250 Kan. 109, 118, 825 P.2d 514 (1992) ("A reasonable person could find that these acts or transactions were in furtherance of a common scheme or plan to sell drugs and to 'discipline' new recruits."). As in *Alcorn*, the "tumultuous" relationship between A.R. and Ross formed part of the common glue between all charges here—including the sex crimes against H.L. and D.L., given the backdrop of control and violence Ross cultivated and threatened in their lives. We thus reverse the panel and affirm the district court's conclusion that the five cases could be consolidated together as part of a common scheme or plan.

*The district court did not abuse its discretion in consolidating the cases for trial.*

"After the district court makes a legal determination regarding whether one of the conditions precedent apply, K.S.A. 22-3202(1) gives it discretion to decide whether or not to join the charges." *State v. Gaither*, 283 Kan. 671, 685, 156 P.3d 602 (2007). See also *Smith-Parker*, 301 Kan. at 160; *Hurd*, 298 Kan. at 561.

We first address Ross' contention that, because the State's petition for review did not specifically ask us to consider whether the district court abused its discretion by consolidating the cases even if one of the conditions in K.S.A. 22-3202(1) were satisfied, we are prohibited from doing so by Supreme Court Rule 8.03(b)(6)(C)(ii) (2025 Kan. S. Ct. R. at 56)—which requires a petitioner to "present" issues "presented to the district court and the Court of Appeals but not decided by the Court of Appeals"—and *State v. Scheetz*, 318 Kan. 48, 67, 541 P.3d 79 (2024).

But *Scheetz* is distinguishable. In *Scheetz*, a panel of the Court of Appeals overturned the district court's conclusion that the defendant's internet search history was relevant for propensity under K.S.A. 2021 Supp. 60-455(d), and then the panel declined to consider whether the evidence—even if relevant—was unduly prejudicial. *State v. Scheetz*, 63 Kan. App. 2d 1, 29, 524 P.3d 424 (2023), *rev'd in part, vacated in part* 318 Kan. 48, 541 P.3d 79 (2024). Instead, the panel combined the district court's purported evidentiary error with other errors to find cumulative error, ultimately reversing *Scheetz*'s conviction. 63 Kan. App. 2d at 29, 36. The State petitioned for review, and Scheetz did not cross-petition for review of the panel's failure to consider undue prejudice. 318 Kan. at 67. After reversing the panel's relevance analysis, we said:

> "Finally, we note the panel declined to address undue prejudice under K.S.A. 60-445 as it found the evidence irrelevant. Scheetz failed to cross-petition on this matter. See Supreme Court Rule 8.03(c)(3) (if Court of Appeals assumes an outcome on an issue

21

without deciding or does not decide an issue properly presented to it, 'the cross-petitioner must raise that issue to preserve it for review') (2023 Kan. S. Ct. R. at 57). Consequently, we do not proceed to the undue prejudice question." 318 Kan. at 67.

In other words, Scheetz—as the prevailing party below on the matter of relevance, which is one aspect of the overall issue concerning admissibility of propensity evidence—failed to cross-petition the panel's failure to consider abuse of discretion— which is another aspect of the overall issue concerning admissibility of propensity evidence. We reversed the panel on relevance, but because we had not been prompted to address abuse of discretion, we did not do so. In contrast, the State—which did *not* prevail before the panel—has here asked us to reverse the panel's conclusion "that the district court erred by consolidating defendant's five cases for trial." While the State's petition focused on whether the consolidated cases satisfied any of the requirements of K.S.A. 22-3202(1), its argument placed the entire issue before us—including the abuse of discretion component. This satisfies Rule 8.03(b)(6)(C)(ii)'s requirement that the petitioner must "present" the issues "that were presented to the district court and the Court of Appeals but not decided by the Court of Appeals."

Having concluded that the district court neither committed an error of fact nor law in finding that the case satisfied one of K.S.A. 22-3202(1)'s requirements, our only remaining inquiry under the abuse of discretion framework is whether, despite the existence of a common scheme or plan, no reasonable person would have consolidated the cases together for trial. *Smith-Parker*, 301 Kan. at 160 (quoting *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 [2011]); cf. *State v. Donaldson*, 279 Kan. 694, 700, 112 P.3d 99 (2005). As the party alleging error, Ross bears the burden of showing that the district court abused its discretion. *Smith-Parker*, 301 Kan. at 161.

In its written order, the district court found that "the probative value of consolidating the five cases outweighs any undue or unfair prejudicial effect." It also

concluded that "[c]onsolidating the five cases will not prevent defendant from getting a fair trial; will promote judicial economy and through the required instructions, will provide sufficient safeguards for defendant." The district court then ordered that Ross would be given PIK Crim. 4th 68.060 as an additional protection. This instruction provides:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

In assessing the reasonableness of the district court's discretion, we first underscore the choice that lay before it: either (1) order separate trials, or (2) order a consolidated trial. Our concern lies only with the potential for undue prejudice under the second choice—irrespective of the latent, unavoidable prejudice under the first choice. Thus, in assessing the prejudice Ross suffered from consolidation, we look to what evidence could have come in at each hypothetical separate trial and how that evidence could have impacted the jury's view of Ross. Further, Ross bears the burden of showing that the district court abused its discretion.

Viewed through this lens, Ross experienced less actual prejudice from joinder than the panel suggested. While we are wary of hypotheticals, it appears that evidence of Ross' ongoing domestic violence crimes could have come in during a separate trial on his sex crimes, given K.S.A. 2024 Supp. 60-455(b)'s permissiveness when evidence is "relevant to prove some other material fact including . . . plan." As discussed above, the girls' knowledge of Ross' violence against their mother—and the fear that he would hurt them if they disclosed his crimes—formed a major component of the State's case on the sex crime charges. And regardless of whether evidence of the PFA violations could have

23

come in during either other trial, we see little potential that those charges could have had much impact on any reasonable jury.

This just leaves the impact of Ross' sex crimes, viewed in isolation, on a hypothetical trial solely on the domestic violence charges. Although child sex crimes are understandably reviled by society, Ross provides little to demonstrate that a jury would be more likely to convict on domestic violence charges solely because it also heard evidence about sex crimes against the victim's daughters—particularly given A.R.'s assertion that she did not know about these crimes until after the police made contact on May 17. Consequently, on these facts, we cannot say that no reasonable person would have consolidated the cases, and we conclude the district court did not err by doing so. We thus reverse the panel's conclusion that the district court erred in consolidating Ross' cases for trial and affirm the district court.

*The prosecutor did not err in opening statements.*

The State next challenges the panel's conclusion that the prosecutor erred in opening statements by saying that:

> "It's not about any one incident. It's about a course of conduct, a course of terrorizing and controlling an entire household and treating them like the property that they were to him. They were his to touch any time he wanted in any way he wanted, and that's exactly what he did and they're going to tell you about that. After you hear from them and the other witnesses and after you see all the exhibits, I'm going to stand right here and I'm going to ask you to find him guilty of every single charge, because that's what the evidence and the testimony is going to prove to you, that he is guilty."

The State argues that, because its theory involved charges "joined together as being part of a common scheme[,] . . . it is nonsensical that a prosecutor cannot talk about the common scheme that cases have been joined under without committing prosecutorial

24

error." Ross also cross-petitions for review of the panel's conclusion that any error was individually harmless.

*Standard of review*

We apply a two-step framework when reviewing claims of prosecutorial error in opening statements and closing arguments. First, we consider whether the prosecutor exceeded the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). We do not consider any statement in isolation but rather look to the context to determine whether error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020). Second, if error is found, the State must show beyond a reasonable doubt that the error did not affect the trial's outcome in light of the whole record, i.e., that "there is no reasonable possibility that the error contributed to the verdict." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018).

*Discussion*

The panel viewed the prosecutor's comment as "group[ing] the domestic violence and sexual abuse charges with the phrase, '[t]hey were his to touch any time he wanted in any way he wanted,' in a way which invited the jury to use evidence of sexual abuse to support domestic violence and vice versa." *Ross*, 2024 WL 2991176, at *21. We disagree. In the context of the prosecutor's opening statements as a whole, there was no error.

The challenged remark came at the end of the prosecutor's opening statements, capping off the theme she had been building from the beginning: "Ross was in charge. For all intents and purposes, [Ross] was the boss of his house. He controlled everything

25

in it and everyone in it." Throughout opening statements, the prosecutor laid out the expected testimony that would further the theme that Ross was "in control" of A.L., H.L., and D.L. By discussing Ross' course of conduct, the prosecutor was not telling the jury that, if Ross was guilty of A, he must also be guilty of B—she was describing the State's theory of Ross' common motivation behind *all* the charged crimes.

Throughout the remainder of opening statements and closing arguments, the prosecutor walked the jury through the evidence supporting each charge with no implication that it should consider evidence of one crime to support the existence of another. Even in the challenged comment, the prosecutor did not "invite[] the jury to use evidence of sexual abuse to support domestic violence and vice versa"—she simply reiterated the State's theory of the case, i.e., that Ross' crimes all occurred within the same penumbra of violence, domination, and control that he wielded over the house. *Ross*, 2024 WL 2991176, at *21. Indeed, the State's phrase, "It's not about any one incident. It's about a course of conduct," only reads as an inaccurate statement of law—rather than a thematic exploration of motive and modus operandi—if a law-trained reader replaces the word "It" with abstract legal concepts such as "The State's burden of proof" or "Ross' guilt" or "Your deliberations." We find it unlikely that the jury would make this leap, given the preceding context. Consequently, we find no error in the prosecutor's comment.

Because we conclude that the prosecutor did not err, we need not address Ross' contention that any error was not individually harmless.

*Ross failed to preserve a challenge to the State's inadvertent violation of the district court's order in limine.*

We next turn to Ross' claim that the panel erred by concluding that he failed to preserve for appeal the prosecutor's inadvertent mistake in publishing part of an unredacted 911 call, and that the panel should have concluded that this mistake was not

26

individually harmless. He does not style this claim as a matter of prosecutorial error, but rather as an "evidentiary error" subject to the harmlessness analysis of K.S.A. 2024 Supp. 60-261.

*Standard of review*

"Appellate courts are obligated to address claims properly raised in district court and later appealed. But if a claim is not effectively raised below, the general rule gives appellate courts the discretion to refuse consideration of that issue." *State v. Genson*, 316 Kan. 130, 135, 513 P.3d 1192 (2022).

*Additional facts*

Before trial, the district court granted Ross' motion in limine that generally forbade the State from introducing evidence of Ross' criminal history and prior bad acts.

Near the beginning of trial, the State played a recording of the 911 call made by the postal inspector on May 17, 2019. While the prosecutor believed the recording had been redacted to remove references to uncharged allegations of rape and witness intimidation, she inadvertently played part of the unredacted copy for the jury—though the district court noted that "the recording was stopped immediately after the word rape came out."

Ross' counsel did not object after the recording was played. Instead—after he cross-examined the postal inspector, and before the State's next witness—he asked to approach the bench. At the bench, Ross' counsel expressed concern about "how to unring that bell" because "I thought based on the motion in limine—I understand it's not a conviction, but we're getting into disclosures of Mr. Ross' criminal history that would be prejudicial. I just wanted to note that for the record." After the State discussed the

27

matter—admitting, "It's not admissible"—the district court told Ross' counsel, "I just need to know what you want to do. You've got a host of options for requests. Whether I grant them or not is another thing. I don't hear you asking for a mistrial or anything like that." Ross' counsel told the court he was "not asking for a mistrial" and that his "point simply is I think we need a redacted—if that's going to go back to the jury, we need it redacted." The district court agreed:

> "Well, that's a given. It's disappointing that that came in. So the issue is you'll get a limiting instruction if you want it. I'm not going to tell you my opinion because I don't know. You didn't object realtime. I mean, I looked at you and you looked at me. You were obviously on top of the situation, so I want the record to reflect that. You, I assume, made a very intentional decision not to highlight it by objecting to it and instead asked to approach. So the record should be clear that you were very much aware realtime of this.
>
> "So I can give a limiting instruction now, I can give one in writing at the end, or I can do it at a break. It's going to be your call. In terms of the nature of the limiting instruction, I'll consider everything. . . ."

Ross' counsel declined to do anything about it "now," which the district court acknowledged was a fair strategy.

Later, the district court summarized for the record a conference the parties had just after the court broke for lunch. The court noted that they

> "talked about options for a curative instruction or some type of a limiting instruction, whether from the bench right now or at the end. The State offered to do whatever the defense wanted, I suppose within reason, to address that. I think the idea—at least I think [Ross' counsel] is taking the approach that at this point he doesn't want to highlight it. He didn't want to highlight it when it happened.

"There's the chance that the reference to a rape could be to the allegations . . . in 19CR2036, which I think that's a fair possibility that the jury could just assume that's what the reference was. It was certainly an innocent matter. So I think [Ross' counsel] is just going to wait till the end and kind of see how things fall and then you can make your request at that point."

Subsequently, the State introduced a properly redacted recording into evidence. The district court also admitted the unredacted version for appellate purposes.

After the close of the State's evidence—and after the district court denied the defense's motion to dismiss for insufficient evidence—the defense again brought up the 911 call:

"I've reflected on that throughout the course of the trial. I believe that because there are sexually related charges in this case that the best course of action is simply to do nothing. So I'm not requesting any kind of a limiting instruction or anything else. I believe it's best to just let that stand where it is."

The district court agreed that "there's different strategies when this sort of thing happens" and commented that many of the facts "going on in the courtroom" that support lawyers' strategic decisions "are not in a black and white record." The district court also noted that "the parties have been conscientious about this. . . . Nothing slipped by other than the actual 911 tape recording, that part of the recording."

After trial, Ross and his counsel filed motions for new trial. Neither mentioned the State's inadvertent publication of the 911 call with the word "rape." Nor did Ross' attorney mention it when he argued the motion at sentencing.

*Discussion*

The panel concluded that, although Ross satisfied the contemporaneous objection rule of K.S.A. 60-404, he later abandoned the issue by failing to request a remedy and by failing to mention it in his motion for new trial.

Ross claims that, once an evidentiary error is identified, K.S.A. 2024 Supp. 60-261 automatically requires the State to prove the error was harmless on appeal. But this construction transforms K.S.A. 2024 Supp. 60-261 into a ticking time bomb, whereby an attorney may constructively "object" to an evidentiary error, ask that the court do nothing, and simply wait and see whether the wind blows in their client's favor for the remainder of the jury trial—before claiming on appeal that the error renders the verdict fatally reversible. Our caselaw cuts against this construction:

> "If a motion in limine is granted to preclude the introduction of certain evidence at trial, and the party who obtained the favorable ruling fails to object to evidence introduced in violation of the order in limine, the failure to object results in the issue not being preserved on appeal." *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003).

In *Decker*, the parties stipulated—in response to a pretrial motion in limine—not to introduce evidence of chickens pecking at a victim's body. 275 Kan. at 506. While the defense attorney was cross-examining the sheriff's captain who investigated the killing, the captain referenced the defendant "urinat[ing] on the grave." 275 Kan. at 506. The defense counsel "cut off" the rest of the captain's testimony, objecting that it was not responsive and that "'[h]e's now putting in facts that he clearly knows are not to be put in front of this jury.'" 275 Kan. at 506-07. Defense counsel did not move for a mistrial or ask that the jury disregard the testimony. 275 Kan. at 507. We deemed the issue unpreserved for appeal, citing *State v. Moncla*, 262 Kan. 58, 66, 936 P.2d 727 (1997)

(failure to object rendered the error unpreserved; defense also failed to request a mistrial or a limiting instruction). 275 Kan. at 507.

Here, the district court gave Ross' counsel several opportunities to request a remedy throughout the trial; at each juncture, Ross' counsel chose to do essentially nothing as a matter of strategy. The district court readily granted the *only* curative action Ross' counsel requested: to send a redacted exhibit to the jury instead of the original, inadvertently published exhibit. By failing to request any greater remedy than a redacted exhibit—which was granted—Ross' counsel failed to preserve the issue for appeal. The district court took the corrective action requested; if Ross' counsel believed a greater remedy was required, he deprived the district court of the opportunity to assess that remedy in the moment.

Because Ross failed to preserve this issue for appellate review, we need not consider whether it was individually harmless.

*The doctrine of cumulative error does not afford Ross relief.*

The State also sought review of the panel's decision that Ross' convictions should be reversed for cumulative error. But, unlike the panel, we have found no errors. Thus, the cumulative error doctrine does not apply.

Finally, we note that the State did not petition for review of the panel's conclusion that the jury's decision to return guilty verdicts on counts two and three of 19-CR-2036—which were charged in the alternative based on a binary question of whether the claimed act occurred *before* or *after* H.L.'s 14th birthday—warranted reversal of those two convictions under *State v. Hernandez*, 294 Kan. 200, 207, 273 P.3d 774 (2012). *Ross*, 2024 WL 2991176, at *27-28. Because that aspect of the panel's decision is not before us, we leave it undisturbed.

31

CONCLUSION

We reverse the Court of Appeals panel's decision reversing most of Ross' convictions, except for the two convictions for which the State did not seek review: counts two and three of 19-CR-2036. We remand the case to the district court for further proceedings on those counts. We otherwise affirm Ross' convictions and sentence.

Judgment of the Court of Appeals reversing the district court on the issues subject to review is reversed. Judgment of the district court is affirmed on the issues subject to review, and the case is remanded.